NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0140n.06

Nos. 14-1158/1172/1276

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>JPMORGAN CHASE BANK, N.A.,</td><td>)</td><td rowspan="13"><strong>FILED</strong><br><em>Feb 20, 2015</em><br>DEBORAH S. HUNT, Clerk</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellant/Cross-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>LARRY WINGET; LARRY J. WINGET LIVING</td><td>)</td></tr>
<tr><td>TRUST,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendants-Appellees/Cross-Appellants.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: COLE, Chief Judge; and GRIFFIN, Circuit Judge; and CARR, District Judge.[*]

GRIFFIN, Circuit Judge.

This diversity action is the latest chapter in a longstanding dispute between the parties over a credit agreement between defendant JPMorgan Chase ("Chase") and entities owned and operated by plaintiff Larry Winget, some assets of which are held by the Larry J. Winget Living Trust ("the Trust"). In these cross-appeals, Chase appeals the district court's decision to reform the parties' Guaranty Agreement; in that decision, the district court rewrote the agreement, capping the Trust's exposure coextensively with Winget's. Winget and the Trust appeal the district court's grant of summary judgment to Chase on its remaining claims, and the district court's entry of final judgment and denial of sanctions against Chase's attorneys. For the

---

[*]The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

following reasons, we reverse the district court's reformation decision and remand to the district court with instructions to enter judgment as to Count I of Chase's complaint in favor of Chase, consistent with the holding of this opinion. However, we affirm the district court's judgment in all other respects.

I.

A.

Winget is an inventor and businessman. In the 1970s, he formed Venture Holdings Company, LLC ("Venture"). Venture included subsidiaries engaged in the business of manufacturing auto parts. Winget controlled other non-Venture enterprises as well, specifically a company in South Africa, the stock of which was held by PIM Management Co. ("PIM"), and a company in Australia, the stock of which was held by Venco #1, LLC ("Venco"). Both PIM and Venco are Michigan entities.

In 1999, Venture received $450 million in financing to obtain a European company called Puguform. Multiple lenders contributed funds to the loan, and Chase was the administrative agent for the lenders.[1] Puguform eventually became insolvent, triggering defaults and acceleration clauses in the 1999 credit agreement. All parties wanted to avoid a default by Venture. In exchange for forbearance, however, Chase and the lenders required new, additional collateral. Accordingly, the parties negotiated an amendment to the credit agreement ("the Eighth Amendment") that would forestall the acceleration. In October 2002, the parties' respective obligations under the amended agreement were codified into four documents: The Eighth Amendment, a Guaranty Agreement ("Guaranty"), and two Pledge Agreements.

---

[1]Some of the documents in the record refer to Bank One, Chase's predecessor.

The opening paragraph of the Guaranty described both Winget personally and the Trust collectively as "the 'Guarantor.'" Section 3 of the Guaranty contained the following provisions:

> [T]he Guarantor hereby absolutely and unconditionally guarantees, as primary obligor and not as surety, the full and punctual payment . . . and performance of the Secured Obligations, including without limitation any such Secured Obligations incurred or accrued during the pendency of any bankruptcy, insolvency, receivership, or other similar proceeding . . . .

> * * *

> Notwithstanding anything herein or elsewhere to the contrary, no action will be brought for the repayment of the Guaranteed Obligations under this Guaranty and no judgment therefor will be obtained or enforced against Larry Winget other than with respect to the Pledged Stock [described in the Pledge Agreements] in accordance with provisions of the related pledge agreements . . . .

Critically, although Section 3 specifically mentions that Winget's personal exposure is limited, it does not mention the Trust at all.

The Pledge Agreements contain several provisions relevant to this appeal. First, as PIM and Venco were part of the new collateral over which the parties negotiated, the Pledge Agreements granted the lenders security interests in the stock of PIM and Venco, respectively. For purposes of this appeal, the security interest granted to the lenders in PIM stock may be referred to herein as the "Winget-PIM pledge."

Second, in Section 10, the Pledge Agreements specify that

> [i]n the event that (i) [Chase] receives for application on the Obligations an amount of not less than $50,000,000 from the sale or financing of the Pledgor's Australia or South Africa operations or from one [or] more outside sources . . . the obligations of the Pledgor hereunder shall be deemed satisfied and the pledge created hereby shall be terminated.

Third, the Pledge Agreements each contain an identically-worded "Last Resort" provision, which states:

> Notwithstanding anything herein or elsewhere to the contrary, [the lenders] shall not exercise any rights or remedies . . . until all reasonable efforts shall have been made by [them] to collect the Obligations from other collateral held by [the

-3-

> lenders] . . . it being intended that the Collateral provided by this Pledge Agreement shall be realized upon by [the lenders] only as a last resort.

As this court previously noted, "[t]he 'other collateral' that must first be pursued by [Chase] is not defined." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (*Winget I*).

> Fourth, the PIM pledge includes the following relevant language, in Section 12:
>
> [The lenders] acknowledge[] and agree[] that the purpose of this Pledge Agreement is to allow a pledge of [PIM's] shares for the sole purpose of obtaining security in the shares of [one of the Venture-controlled entities,] Venture Holdings BV and Venture Asia Pacific . . . which are held by [PIM].

At some point, PIM executed a pledge of Venture Holdings BV, as well as a pledge of shares in Venture Asia Pacific. For purposes of this appeal, this is referred to as the "PIM-VB pledge."

> The Eighth Amendment contains an integration clause, which states, in relevant part:
>
> The Credit Agreement, as previously amended and as amended by this Amendment, constitutes the entire understanding of the parties with respect to the subject matter hereof and may only be modified or amended by a writing signed by the party to be charged.
>
> In March 2003, Venture filed for Chapter 11 bankruptcy. This triggered a default under

the Eighth Amendment. In April 2005,

> the bankruptcy court ordered the sale of substantially all of Venture and Deluxe's[2] assets pursuant to Section 363 of the Bankruptcy Code (the "Sale Order"). The sale commenced in May 2005, and the proceeds of the sale were applied to Venture's outstanding balance under the Credit Agreement. Following the sale, however, a large amount of Venture's debt remained outstanding under the Credit Agreement.

*Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 571 (6th Cir. 2008) (*Winget II*).

Specifically, the district court found that approximately $375 million remained due. *Winget v. JP Morgan Chase Bank, N.A.*, 2007 WL 715342, at *2 (E.D. Mich. Mar. 7, 2007).

---

[2]Deluxe was another entity that provided guarantees in the Eighth Amendment.

Later in 2005, Chase brought suit to exercise its rights to inspect the books and records of PIM and Venco; this court affirmed that Chase was entitled to inspect the books. *Winget I*, 510 F.3d at 579.

Meanwhile, Winget sued Chase, alleging, inter alia, that Chase and the lenders engaged in a scheme to devalue some of the Venture-controlled entities prior to the bankruptcy proceeding. *See Winget II,* 537 F.3d at 577–81. This court held that those claims were barred by res judicata because they could—and should—have been brought in the bankruptcy proceeding. *Id*. This court also held that

> to the extent that Winget's claims challenge the [lenders'] compliance with the Last Resort Conditions, such claims are premature. These claims are premature because the [lenders] have not yet enforced the Guaranty Documents; when they do so, Winget may then bring a claim that the [lenders] actions violated the Last Resort Conditions.

*Id.* at 581.

In September 2008, the lenders filed the instant action to enforce the Guaranty and Pledge Agreements. The complaint contained three counts: Count I sought to enforce the Guaranty against the Trust; Count II sought to enforce the Guaranty against Winget personally; and Count III sought to enforce the Pledge Agreements against Winget and the Trust.

B.

On November 7, 2008, the Trust filed a motion for judgment on the pleadings as to Count I, arguing that it was undisputed that the Guaranty "provides that no judgment can be obtained against the Trust except with respect to the pledged stock of [PIM] . . . and [Venco]." The district court disagreed, holding that "Section 3 is unambiguous. It names Winget, and Winget alone, in connection with limiting liability under the Guarantee to the Pledged Stock. There is no exception for actions against the Winget Trust."

In response to this ruling, Winget and the Trust moved in January 2009 to amend their answer to include a counterclaim for reformation of the Guaranty. The district court granted the motion.

The counterclaim alleged that the failure to include the Trust in Section 3 was a mutual mistake and that "(i) the written terms of the Guaranty and the Pledge Agreements [should] be read . . . to impose only limited and conditional liability on Winget and the Trust and (ii) the obligations of the Trust to [the lenders] would be no greater in any respect than the obligations of Winget to [the lenders]." It requested reformation of Section 3 consistent with these allegations.

Following over two years of discovery and motion practice, Chase filed a motion for summary judgment in August 2011. The motion argued: (1) that Chase had recourse against the Trust for Venture's unpaid debt because Section 3 is unambiguous; and (2) that the Trust's mutual mistake claim and request for reformation failed as a matter of law.

The district court denied Chase's motion for summary judgment in December 2011. The district court rejected Chase's argument that, because the Guaranty was an unambiguous, fully integrated agreement, no reformation was appropriate, holding "[t]he issue is not whether the Guaranty is ambiguous or unambiguous; the issue is whether the Guaranty should be reformed to reflect the parties' true agreement." The court determined that, based on parol evidence—specifically, documentary evidence developed during the parties' negotiation over the Eighth Amendment—a genuine issue of material fact existed as to the parties' true intent.

The parties proceeded to a bench trial, at which the district court heard testimony from a number of live witnesses. Most of these witnesses were lawyers who were involved in drafting the Eighth Amendment. In general, Chase's witnesses testified that the omission of the Trust from the Eighth Amendment was intentional and meant to secure an unlimited guarantee from

the Trust. By contrast, Winget's and the Trust's attorneys—and Winget himself—testified that the parties all understood at the time of the Eight Amendment's drafting that the Trust's exposure was to be coextensive with Winget's.

On October 17, 2012, following trial, the district court issued its decision on reformation. The district court made more than fifty findings of fact, not all of which are relevant to the issues on appeal. In broad strokes, however, the district court found: (1) that Winget's and the Trust's witnesses were generally credible, whereas Chase's witnesses generally were not—especially because, according to the district court, "there is no suggestion in the evidence that [the inclusion of the Trust as a guarantor was done for the purpose of] enhancing the lenders' collateral position"; (2) that the majority of the parol evidence developed during the negotiations over the Eighth Amendment indicated that the parties intended for Winget and the Trust to be treated as one and the same; and (3) none of the parties otherwise mentioned or discussed the Trust separately and distinctly from Winget, and no one ever mentioned or discussed the Trust having unlimited exposure. Ultimately, the district court concluded:

> The Winget Trust was purposely added to the Eighth Amendment and related documents to secure ownership of the pledged stock. It was not added to secure any additional liability. As such, the failure to include the Winget Trust under Section 3 was a mistake. It was a mistake that was overlooked by both parties. It is a mistake that the court has the power to correct.

Accordingly, the district court reformed Section 3 by adding a term to read:

> . . . no action will be brought for the repayment of the Guaranty Obligations under this Guaranty and no judgment therefore [sic] no judgment [sic] will [sic] obtained or enforced against Larry Winget *and The Larry J. Winget Living Trust* other than with respect to the Pledged Stock.

(Emphasis added.)

C.

After the district court issued its reformation decision, the parties proceeded to litigate the remaining two counts of Chase's complaint. On November 1, 2012, the district court issued a scheduling order. Noting that the issues for trial had been defined at an October 31 status conference, the court set the following issues for trial:

(1) The enforceability of the Pledge Agreements relating to [PIM and Venco] in light of the pledge of shares in Venture Holdings, BV, and the pledge of shares in Venture Asia Pacific.

(2) Reasonableness of the efforts by Chase to sell the collateral remaining subsequent to the sale of Venture's assets in the bankruptcy court.

(3) The text of the judgment to be entered in favor of Chase should it prevail at trial.

The Scheduling Order indicated that "[a]ny objections to this order shall be filed within five business days." No objections were filed.

On December 4, 2012, Chase filed a motion for partial summary judgment on what it characterized as Winget's and the Trust's "enforceability defense" and their "delay" defense. These defenses tracked roughly with the first two issues laid out in the district court's scheduling order. Chase summarized the "enforceability defense" as Winget's and the Trust's assertions in various places in the district court record that the Winget-PIM pledge became unenforceable upon the execution of the PIM-BV pledge. Chase argued, among other things, that the language of the Winget-PIM pledge was unambiguously enforceable because nothing in the Guaranty or Pledge Agreements rendered the Winget-PIM pledge unenforceable upon execution of the PIM-BV pledge.

Chase summarized the "delay defense" as Winget's and the Trust's assertions in various places in the district court record that "Chase has not satisfied the Last Resort provision because

Chase 'unreasonably' delayed in liquidating the Other Collateral [referenced in the Last Resort provision], thereby lowering its value." Chase argued, among other things, that the "delay defense" was barred by res judicata. Specifically, Chase argued that Winget's and the Trust's theory was functionally the same one they advanced in *Winget II*, which the district court and this court had rejected. Chase also noted that the district court in the instant action had previously ruled that, due to *Winget II* and principles of res judicata, "[e]vents prior to May 2, 2005, the date the Venture bankruptcy sale . . . closed, are not relevant to the issue which is the subject of Counts II and III."

Winget and the Trust opposed the summary judgment motion, arguing, among other things, that fact questions remained as to whether Chase's efforts to collect on the other collateral was reasonable within the meaning of the Pledge Agreements, and that res judicata did not bar them from challenging the reasonableness of Chase's efforts. About six months after it filed its opposition to summary judgment, Winget and the Trust filed a supplemental response to Chase's summary judgment motion. The supplemental response asserted that two months before Venture filed for bankruptcy, Venture was approached by Hyundai, which had offered Venture an $800 million contract to produce parts for its automobiles. All that had been needed, Winget and the Trust asserted, was for Chase to advance $8 million in up-front cash to secure the deal. However, according to Winget and the Trust, Chase had refused to front the cash, and then prevented Winget from fronting the money out of his own pocket by threatening to stop supplying Venture with capital in the event the Hyundai proposal went forward at all. Thus, according to Winget and the Trust, whether Chase acted unreasonably in preventing the Hyundai proposal from coming to fruition remained a litigable issue.

The district court granted Chase's motion for summary judgment. As for the "enforceability defense," the district court reasoned that the plain text of the Pledge Agreements belied Winget's and the Trust's assertions. The court held that the agreements make "no allowance for any type of unenforceability upon execution of the PIM-BV Pledge. Winget's argument is inconsistent with these provisions, and there is no ambiguity that could reasonably allow the result he seeks." The district court similarly rejected the "delay defense" for two reasons. First, the court noted that "every [item of 'other collateral'] was an asset of the Venture or Deluxe bankruptcy estates, and their disposition was subject to the bankruptcy process. . . . At bottom, Winget's Delay Defense is a challenge to [the orders of the bankruptcy court and the Sixth Circuit]. Res judicata bars Winget from challenging their disposition." The district court reiterated its earlier holding that "[e]vents prior to May 2, 2005 . . . are not relevant to the issue which is the subject of Counts II and III." Second, the court ruled that the Last Resort provisions were "a timing requirement that ensures that [the] pledges are the last collateral in line for collection. . . . Nothing in the Last Resort provision[s] condition[s] Chase's rights on receiving 'optimal' liquidation value—to be judged in hindsight—for every item of Other Collateral." Finally, the district court rejected Winget's and the Trust's arguments regarding the Hyundai proposal on the basis that the issue should have been raised in the bankruptcy court and was thus barred by res judicata.

On October 1, 2013, Chase filed a motion for entry of final judgment under Rule 54 arguing, in short, that between the district court's reformation decision and its grant of summary judgment, all outstanding issues in the case had been resolved. On December 20, 2013, the district court granted Chase's order for entry of final judgment. The court held:

> Winget's defenses—the enforceability and delay defenses—presented the only
> factual arguments [relevant to the issues in Chase's complaint]. When the Court

> granted summary judgment on these defenses, there was nothing more to adjudicate. . . . Overall, there remain no factual issues for trial and no defenses to judgment. Chase has satisfied the last resort provision, and it is entitled to judgment in its favor on Counts I, II, and III.

The court emphasized that, contrary to Winget's and the Trust's characterization, it was not "granting Chase summary judgment sua sponte. Rather, the Court is entering a judgment in favor of Chase based on the Court's reformation decision and its summary judgment ruling disposing of Winget's defenses."

After the district court entered its final judgment order, Winget wired a $50 million payment to Chase. During the course of litigating the language of the final judgment, Winget and the Trust argued that the final judgment should reflect that the $50 million payment satisfied and discharged Winget's and the Trust's obligations. The district court disagreed, holding that "[t]ermination of the Pledges only affects the scope of Chase's recourse, not the extent of Winget's liability. . . . That liability will not be discharged by the termination of the pledges. Winget's proposed language as to 'satisfaction' and 'discharge' of his liabilities is not reflected in any of this Court's holdings. . . ." The district court thus entered an order that: (1) reiterated the court's reformation decision; (2) as to Count I of Chase's complaint, entered judgment against the Trust in the amount of $425,113,115.59, but limited Chase's "recourse for collection . . . to the terms of Section 3 of the Guaranty"; (3) as to Count II of Chase's complaint, entered judgment against Winget personally in the amount of $425,113,115.59, but limited "Chase's recourse for collection . . . to the terms of Section 3 of the Guaranty"; (4) as to Count III of Chase's complaint, entered judgment in favor of Chase and against Winget and the Trust, holding that Chase is "entitled to enforce all rights granted to it in the Pledges, subject to the Pledgor's rights under Section 10 of the Pledges to terminate the Pledges." Finally, the district

court ordered that Winget and the Trust were liable to Chase, under Section 17 of the Guaranty, for costs and attorney fees incurred by Chase.

### D.

Meanwhile, on September 21, 2012, Winget and the Trust filed a motion for sanctions against Chase and its counsel under Federal Rule of Civil Procedure 11. Essentially, Winget and the Trust argued that because the facts supporting its reformation argument were, in their view, undeniable, Chase's opposition to reformation was sanctionable.

On November 2, 2012—about two weeks after the district court issued its reformation decision in favor of Winget and the Trust—Winget and the Trust filed a motion for sanctions under 28 U.S.C. § 1927, this time specifically against Chase's attorney, William Burgess. The argument was essentially the same as in the Rule 11 motion—that the parties understood at the time of the Guaranty's drafting that their intent was to limit the Trust's exposure to $50 million, and therefore Burgess's assertions to the contrary at trial and in filings were false and sanctionable. The § 1927 motion argued that Burgess specifically directed the falsehoods—thus, he was uniquely positioned to be singled out for sanctions. The § 1927 motion also bolstered its analysis with the then-recent reformation decision, arguing, in short, that because the district court had agreed with Winget and the Trust about reforming the Guaranty, sanctions were appropriate.

The district court denied the § 1927 motion. The court held that none of the cases cited by Winget and the Trust "come close to supporting sanctions under § 1927," and that Winget and the Trust "have failed to establish any misconduct on the part of Burgess. Rather, Winget seeks sanctions against Burgess for a litigation position, which was not frivolous, taken by Chase

where Burgess's role in asserting that position is minor at best. Section 1927 simply does not allow for sanctions under these circumstances."

Having summarized the extensive procedural history of this case, we now turn to the issues raised by the parties in this appeal.

## II.

In its sole issue on appeal, Chase claims that the district court erred when it reformed the Guaranty, rewriting the parties' agreement to make the Trust's exposure coextensive with Winget's. We agree.

## A.

This claim raises issues of the availability of equitable remedies and of contract interpretation. Reformation of a contract due to mutual mistake is an equitable remedy. *Hearne v. Marine Ins. Co.*, 87 U.S. 488, 490 (1874). Generally, "[whether] there is equitable ground for reformation is a question of law for the court," 66 Am. Jur. 2d Reformation of Instruments § 111; *see also McDonald v. Farm Bureau Ins. Co.*, 747 N.W.2d 811, 815 (Mich. 2008). We review de novo questions of law. *Cutter v. Wilkinson*, 423 F.3d 579, 584 (6th Cir. 2005). If an equitable remedy is available, and the district court imposes one, we review that decision for an abuse of discretion. *Anchor v. O'Toole*, 94 F.3d 1014, 1025 (6th Cir. 1996).

"Questions of contract interpretation . . . generally are considered to be questions of law subject to de novo review." *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005).

## B.

A federal court, sitting in diversity, is required to "apply state law in accordance with the then controlling decision of the highest state court." *Bailey Farms, Inc. v. NOR-AM Chemical*

*Co.*, 27 F.3d 188, 191 (6th Cir. 1994). "Further, a federal court in a diversity action is obligated to apply the law it believes the highest court of the state would apply if it were faced with the issue." *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013) (internal quotation marks omitted). We may also look to "published intermediate state appellate court decisions unless we are convinced that the highest court would decide differently." *Id*. at 697 (citation omitted). Thus, our task is to determine whether the Michigan Supreme Court would exercise the "extraordinary . . . remedy" of reformation in the case of an unambiguous, fully integrated agreement by sophisticated and well-represented parties in an arms-length transaction. 66 Am. Jur. 2d Reformation of Instruments § 1. We conclude that it would not and therefore reverse the district court's reformation decision.

The district court found that the Guaranty was unambiguous, and we agree. Winget and the Trust do not argue that the Guaranty is ambiguous. Rather, they argue that the parties made a mutual mistake by omitting the Trust from Section 3. Ambiguity and mutual mistake are distinct legal concepts under Michigan law; indeed, "[a]n omission or mistake is not an ambiguity." *Zilwaukee Twp. v. Saginaw Bay City Ry. Co.*, 181 N.W. 37, 40 (Mich. 1921).

"A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation. The fact that the parties dispute the meaning of a [contractual term] does not, in itself, establish an ambiguity." *Cole v. Ladbroke Racing Mich., Inc.*, 614 N.W.2d 169, 176 (Mich. 2000) (internal citation omitted). The opening paragraph of the Guaranty lists Winget and the Trust as separate entities—accordingly, the parties understood that Winget and the Trust were not interchangeable. Confirming this interpretation is the fact that Winget and the Trust were collectively defined as "guarantor" in the Guaranty's opening paragraph, but in Section 3, Winget is named separately and individually. For these reasons, there is only one interpretation

to which the Guaranty is "reasonably susceptible":  that Winget and the Trust are separate and distinct legal persons.

> A fundamental tenet of [Michigan] jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written.*  Courts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract.  [The Michigan Supreme Court has previously held] that the general rule of contracts is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.

*Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005) (internal quotation marks, footnotes, and alterations omitted).  In other words, "[i]f the contractual language is unambiguous, courts must interpret and enforce the contract as written, *because an unambiguous contract reflects the parties' intent as a matter of law*."  *In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008) (emphasis added).  *See also Quality Prods. and Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003).  Additionally, where the parties include an explicit integration clause within a contract, that clause is conclusive that the parties intended the contract to be the final and complete expression of their agreement.  *See Hamade v. Sunoco Inc. (R & M)*, 721 N.W.2d 233, 248 (Mich. Ct. App. 2006).

Because reformation is an extraordinary equitable remedy, "courts are required to proceed with the utmost caution in exercising jurisdiction to reform written instruments." *Olsen v. Porter*, 539 N.W.2d 523, 525 (Mich. Ct. App. 1995).  Reformation is permitted only under very limited circumstances.  Among those circumstances is the parties' mutual mistake of fact. *Mate v. Wolverine Mut. Ins. Co.*, 592 N.W.2d 379, 384 (Mich. Ct. App. 1998) (holding that reformation is a remedy in mutual mistake cases).  In cases where the parties were mutually mistaken about some essential fact, a court may vary from the default presumption and admit parol evidence to determine the parties' true intent.  *Scott v. Grow*, 3 N.W.2d 254, 259 (Mich.

1942).  A mutual mistake of fact is "an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction."  *Ford Motor Co. v. City of Woodhaven*, 716 N.W.2d 247, 256 (Mich. 2006).

In one strand of mutual mistake cases under Michigan law, a "material fact" is a fact contemplated by the agreement itself.  For example, in *Ford Motor Co.*, the most recent Michigan Supreme Court case on point, Ford

> filed a personal property statement with the appropriate taxing jurisdiction, [the defendant, City of Woodhaven].  But Ford misreported some of the information in its personal property statements.  Because respondents' assessors accepted and relied on Ford's personal property statements as accurate when calculating Ford's tax liability, respondents issued tax bills for amounts in excess of what would have been due had the statements been accurate.

*Id.* at 249.[3]  The Michigan Supreme Court determined that, because both Ford and the tax assessors believed that Ford owned the property when it in fact did not, a mutual mistake of fact existed.  *Id*. at 258–59.  In other words, the court determined that the fact at issue was whether Ford actually owned the property described in the tax filings.

Another example is the seminal case *Sherwood v. Walker*, 33 N.W. 919 (Mich. 1887). There, Walker agreed to sell Sherwood a cow that both parties believed to be barren.  Sherwood bought the cow for a price less than would normally have been paid for a fertile cow.  As it turned out, the cow was fertile, and Walker refused to accept payment for the cow.  The Michigan Supreme Court reasoned that because the fertility of the cow went to the "whole substance of the agreement[,]" the mutual mistake of the parties as to that fact was grounds for equitable relief.  *Id*. at 923.  In *Sherwood*, the "fact" at issue was the cow's fertility, which was certainly contemplated by the parties in their agreement.

---

[3]Although *Ford Motor Co.* dealt with a statutory provision that contained the term "mutual mistake," the court looked to contract law in Michigan for guidance and opined at length over the definition of the term in that context.

The instant case is different from the above-cited cases. This case deals not with the parties' mistake as to a fact contemplated by, and thus memorialized in, the agreement, but rather with the alleged omission from the agreement of a material term based on an alleged mutual understanding not represented in the contract.

Nor is this case consistent with the second strand of mutual mistake cases in Michigan: those which remedy a "scrivener's error." In the mine-run "scrivener's error" case, the parties reach an agreement and, when memorializing that agreement, mistakenly forget to include a term or incorrectly describe an agreed-upon term. For example, in *Scott*, a deed erroneously failed to identify two grantees as husband and wife, listing them instead as "tenants by entireties and not as joint tenants." 3 N.W.2d at 255. The Michigan Supreme Court held that

> [w]herever an instrument is drawn with the intention of carrying into execution *an agreement previously made*, but which by mistake of the draftsman or scrivener, either as to law or fact, does not fulfill the intention, but violates it, there is ground to correct the mistake by reforming the instrument.

*Scott,* 3 N.W.2d at 259 (emphasis added). Indeed, as *Scott* suggests, "[s]uccess in [a case alleging a scrivener's error] requires that the parties to an instrument execute it in the mutually mistaken belief that its terms are those of a valid prior agreement." *City of Farmington Hills v. Farmington Hills Police Officers Ass'n*, 262 N.W.2d 866, 869 (Mich. Ct. App. 1977) (citing *Scott*, 3 N.W.2d at 258). The district court seemed to approach this case through this lens. Citing *Scott*, it noted that "a court of equity has the authority to reform a contract to make the contract conform to the agreement actually made by the contracting parties," and that "if a written instrument fails to express the intention of the parties," a court may reform the instrument. Thus, in the district court's view, the Eighth Amendment, Guaranty, and Pledge Agreements simply codified a prior agreement of the parties, in which they had agreed that the Trust's exposure was to be the same as Winget's personally. That this coextensive exposure was

not reflected in the ultimate instrument was the result of mutual mistake, according to the district court.

We disagree with the district court's interpretation and conclude that there was no prior agreement between the parties. The Eighth Amendment was, and remains, the *only* agreement between the parties. We arrive at this conclusion for the following reasons. First, Winget and the Trust concede that there was no agreement between the parties prior to the Eighth Amendment. At oral argument, Winget's and the Trust's counsel was asked, "[w]hen . . . did a binding contract come into existence?" Counsel responded, "[a] contract came into existence at the time the Eighth Amendment was executed." Second, the pre-Eighth Amendment documents on which Winget and the Trust rely are not evidence of a contract. For example, one such document upon which Winget and the Trust heavily rely as evidence of the parties' intent—a "Summary Term Sheet" which summarizes the proposed agreement—states explicitly that it is "intended as an outline only and does not purport to summarize all the . . . provisions which would be contained in definitive legal documentation for the agreement contemplated hereby." Even more directly, the Term Sheet also states that it "is not a commitment . . . ."

Third, and critically, the Eighth Amendment contains an integration clause stating that the agreement as written down "constitutes the entire understanding of the parties with respect to the subject matter hereof and may only be modified or amended by a writing signed by the party to be charged." Accordingly, the parties understood that the Eighth Amendment was itself the agreement of the parties, and not merely a transcription of a previous agreement. Moreover, in Michigan, "[r]eliance on pre-contractual representations is unreasonable as a matter of law when the contract contains an integration clause." *N. Warehousing, Inc. v. Dep't of Educ.*, 714 N.W.2d 287, 287 (Mich. 2006). That is because "an integration clause nullifies all antecedent

agreements," and therefore "when the terms of a commitment and a subsequently enacted [contract] conflict and the [contract] contains an integration clause, the terms of the [contract] must control." *Archambo v. Lawyers Title Ins. Corp.*, 646 N.W.2d 170, 177 (Mich. 2002) (citing 3 Corbin, Contracts § 578, p. 404). Thus, even assuming that the Term Sheet or any other pre-Eighth Amendment documents did amount to a binding agreement, that agreement would have been nullified by the Eighth Amendment, rendering the Eighth Amendment the only agreement between the parties. Therefore the district court's apparent conclusion that the omission of the Trust from Section 3 of the Guaranty was a mere "scrivener's error" is unsupported.

For these reasons, we conclude that the district court's finding of mutual mistake was erroneous. Therefore, we conclude that the equitable remedy of reformation was not available. The district court held a trial to determine what the parties had agreed upon. However, because the Eighth Amendment, Guaranty, and Pledge Agreements constituted the only agreement between the parties, and because the agreement is unambiguous, the district court should never have held a trial in the first instance. The agreement executed by Winget, the Trust, and Chase "reflect[ed] the parties' intent as a matter of law," and contrary to the district court's conclusion, the parties did not agree to treat Winget and the Trust as one and the same. *In re Smith Trust*, 745 N.W.2d at 758. Rather, the plain text of Section 3 names Winget, and only Winget, as having limited exposure. The district court's decision to rewrite the parties' agreement to add a term must be reversed. We therefore remand this case to the district court with instructions to enter judgment on behalf of Chase on Count I of Chase's complaint, consistent with our holding.

III.

We now turn to the issues raised by Winget and the Trust in their cross-appeal. Winget and the Trust first argue that the district court erred by concluding that their "enforceability" and

"delay" defenses are barred by res judicata. These defenses are not so barred, Winget and the Trust argue, because of the Supreme Court's holding in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), and this court's later decision in *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012). We disagree.

A.

The applicability of *Stern* and *Waldman* to Winget's and the Trust's defenses is a question of law and is therefore reviewed de novo. *See Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 836 (6th Cir. 1997).

Winget's and the Trust's argument on this issue also implicates the district court's summary judgment ruling. "We review de novo the district court's grant of summary judgment. Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014) (internal citation omitted).

B.

In *Stern*, the Supreme Court addressed claims arising from the bankruptcy of Vickie Marshall ("Vickie"), also known as Anna Nicole Smith. Vickie's husband, Howard Marshall ("Howard"), omitted her from his will. Vickie filed suit in a state court against Howard's son, Pierce, alleging that he fraudulently induced Howard to sign a living trust excluding Vickie. 131 S. Ct. at 2601. After Howard's death, Vickie filed for bankruptcy. Pierce filed a complaint in the bankruptcy court, claiming that Vickie had defamed him; he also sought a declaration that his defamation claim was non-dischargeable in bankruptcy. *Id.* Pierce filed a proof of claim and sought damages on his defamation claim from Vickie's bankruptcy estate. Vickie responded by

filing a tortious interference counterclaim, alleging that Pierce improperly prevented Howard from providing her with half his property, as the couple had intended. *Id*. The bankruptcy court found in Vickie's favor on both Pierce's defamation claim and on her counterclaim for tortious interference. *Id*.

The issue for the Supreme Court was whether the bankruptcy court had jurisdiction— statutorily and constitutionally—to resolve Vickie's counterclaim for tortious interference. *Id*. at 2600–01. The Court reasoned that, although the bankruptcy court had statutory authority to resolve the counterclaim, it lacked constitutional authority to do so. The Court held that Vickie's counterclaim was "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." *Id*. at 2611. Thus, the Court held that, by entering a final judgment on a state-law claim unrelated to the bankruptcy proceeding, the bankruptcy court "exercised the judicial power" reserved for Article III courts. *Id*. at 2601.

> In *Waldman,* this court summed up Stern as follows:
>
> When a debtor pleads an action under federal bankruptcy law and seeks disallowance of a creditor's proof of claim against the estate . . . the bankruptcy court's authority is at its constitutional maximum. But when a debtor pleads an action arising only under state-law . . . or when the debtor pleads an action that would augment the bankrupt estate, but not "necessarily be resolved in the claims allowance process[,]" . . . then the bankruptcy court is constitutionally prohibited from entering final judgment.

*Waldman*, 698 F.3d at 919 (internal citations omitted).

Thus, our inquiry in this case is where Winget's and the Trust's defenses fall on this spectrum. Are Winget's and the Trust's defenses matters of pure state law, or are they the types of defenses that must necessarily be resolved in the bankruptcy court? To that end, it is

important to note that Winget and the Trust never say *which* of their defenses is applicable to their arguments under *Stern* and *Waldman*. In reality, only the "delay defense" is.

The district court correctly synthesized Winget's and the Trust's defenses into two categories: "enforceability" and "delay." Winget and the Trust do not object to this framing of the issues. The "enforceability defense" alleged that the Winget-PIM pledge became unenforceable after the execution of the PIM-BV pledge. This defense is in no way predicated on the bankruptcy proceeding. It is purely a matter of contract interpretation, and that is how the district court resolved it. The district court did not rely on the bankruptcy proceeding in resolving the "enforceability defense" because no party asked it to. Indeed, the district court's holding that "[e]vents prior to May 2, 2005 . . . are not relevant"—which appears to be the primary holding to which Winget and the Trust object in their *Stern* argument—was made specifically with respect to the "delay defense" and not the "enforceability defense." Whether the district court was correct in resolving the "enforceability defense" in Chase's favor is one of the issues on appeal and is analyzed in full below. But this resolution does not depend on the bankruptcy, and thus, neither *Stern* nor *Waldman* is applicable to the "enforceability defense." Accordingly, we reject Winget's and the Trust's arguments to the extent they request that we reverse the district court's ruling on the "enforceability defense" because of its ruling on res judicata arising from the Venture bankruptcy.

However, the district court's resolution of the "delay defense" was predicated on res judicata arising from the Venture and Deluxe bankruptcy case. We conclude that because the "delay defense" focuses on the value of the assets disposed of in the bankruptcy, it is not a pure common law claim like the one at issue in *Stern*, but rather goes—as this court previously found—to "the heart of the [bankruptcy] Sale Order[s]." *Winget II*, 537 F.3d at 580.

The crux of the "delay defense" is that Chase violated the Last Resort provisions—which require that Chase seek recourse through "other collateral" before exercising its rights under the Pledge Agreements—by "unreasonably" delaying liquidation of Venture's and Deluxe's assets in order to lower their value. In other words, by arguing that Chase acted "unreasonably" in disposing of "other collateral" in violation of the Last Resort provisions, Winget and the Trust challenge the value of the assets disposed of in the Venture bankruptcy—at least to the extent the "other collateral" consists of assets disposed of in the bankruptcies.[4] Winget and the Trust had an opportunity to challenge the value of those assets in the bankruptcy proceedings, and the bankruptcy court is the appropriate forum for such arguments. *Stern* did not deprive the bankruptcy court of its jurisdiction to consider the "delay defense" because—despite Winget's and the Trust's attempts to label it as a pure common law argument—the "delay defense" at its core is simply another challenge to the value of the bankruptcy assets. Case law supports this conclusion. *Compare In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 562 (9th Cir. 2012) (holding that state-law fraudulent-transfer claims brought by the bankruptcy trustee could not be resolved by the bankruptcy court in light of *Stern*) *with In re Spillman Dev. Grp. Ltd.*, 710 F.3d 299, 305–06 (5th Cir. 2013) (holding that the bankruptcy court's authority to issue a judgment about a creditor's credit bid did not run afoul of *Stern* because, unlike in *Stern*, where Vickie's counterclaim was "in no way reliant or dependent on proceedings in bankruptcy—it just happened to have been a counterclaim to a claim asserted in a bankruptcy proceeding," the creditor's claim was not a state law action independent of the federal bankruptcy law but was "inextricably intertwined with the interpretation of a right created by federal bankruptcy law").

---

[4]To the extent that the "other collateral" includes the Hyundai proposal, we address that claim below.

Accordingly, the district court did not err in granting summary judgment to Chase on the "delay defense" based on res judicata, despite the holdings of *Stern* and *Waldman*.

IV.

Next, Winget and the Trust argue that the district court erred by granting Chase summary judgment on their "enforceability" and "delay" defenses for reasons other than the holdings of *Stern* and *Waldman*. We disagree.

A.

We first address the "enforceability defense." Winget and the Trust argue that the lenders' security interest in PIM (i.e. the Winget-PIM pledge) became unenforceable after Winget "cause[d] PIM to provide Chase with a pledge of its shares in Venture Australia [and BV]" (i.e. the PIM-BV Pledge). In other words, Winget and the Trust argue, as they did below, that "the parties intended the [Winget-]PIM Pledge to function merely as a placeholder" and that once the PIM-BV pledge was executed, the Winget-PIM pledge became unenforceable by operation of the "sole purpose" language of Section 12 of the Pledge Agreements.

As explained above, unambiguous contracts must be enforced as written, and generally only in the case of ambiguity are courts permitted to consider extrinsic evidence of parties' intent. *Rory*, 703 N.W.2d at 30; *In re Smith Trust*, 745 N.W.2d at 758. Winget and the Trust simultaneously argue that the PIM Pledge Agreement is ambiguous and unambiguous—on the one hand arguing that its plain language supports their position, while on the other hand arguing that the PIM Pledge Agreement "create[s] an ambiguity not subject to resolution as a matter of law." We conclude that the district court's analysis was correct—the contract language unambiguously provides that Chase is entitled to summary judgment on this defense.

The PIM pledge specified how it could be terminated.  Section 7.14 states:

> This Pledge Agreement shall continue in effect . . . until no Obligations or commitments or commitments by [Chase] which could give rise to Obligations shall be outstanding, except as provided in Section 10 . . . .

Section 10 stated, in pertinent part:

> [i]n the event that . . . [Chase] receives for application on the Obligations an amount of not less than $50,000,000 from the sale or financing of the Pledgor's Australia or South Africa operations or from one [or] more outside sources . . . the obligations of the Pledgor hereunder shall be deemed satisfied and the pledge created hereby shall be terminated.

The Pledge Agreement thus unambiguously specifies that the way to satisfy the pledgor's obligation under the agreement was to pay Chase $50 million.  Section 12 does not provide otherwise.  The "sole purpose" language in Section 12 creates restrictions on Chase's actions in collecting on the pledge—it does not provide that Chase's rights to PIM become unenforceable upon the satisfaction of the PIM-BV pledge.  Indeed, after the "sole purpose" language, Section 12 states:  "Therefore, [Chase] agrees to not interfere with [PIM] (i) operating its business; (ii) disposing, transferring, or encumbering its [non-BV assets], and (iii) to reasonably cooperate with the Pledgor and [PIM] in consummating any transaction in which the Pledgor proposes to separate the [non-BV assets] from the assets of [PIM]."  Other sections of the contract confirm this interpretation of Section 12:  the Eighth Amendment lists *both* PIM and BV as collateral, as does the Last Resort provision of the Pledge Agreement.  *See Vushaj v. Farm Bureau Gen. Ins. Co. of Michigan*, 773 N.W.2d 758, 760 (Mich. Ct. App. 2009) (terms used in a contract must be read in context along with other provisions).  Indeed, as the district court noted, even Section 12 itself "contemplates enforcement of the Winget-PIM pledge by requiring that, when Chase takes control of PIM's stock, it cooperate in transactions to transfer non-BV assets from PIM."

Winget's and the Trust's argument to the contrary is unavailing.  They argue that the Pledge Agreement provides for the unenforceability of the Winget-PIM pledge because Section

12 was specifically negotiated, whereas Sections 7.4 and 10 are "boilerplate." However "courts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). Interpreting the contract in the way Winget and the Trust propose would render the portions of the contract that list both PIM and BV stock nugatory because this interpretation would ignore Sections 7.4 and 10 altogether. Thus, Winget's and the Trust's argument that the contract unambiguously supports their "enforceability defense" fails.

Winget and the Trust also assert that the "sole purpose" language conflicts with the section of the Pledge Agreement establishing the Winget-PIM pledge. However, as explained above, there is no conflict—Section 12 provides restrictions on Chase's rights to collect; it does not deprive Chase of its security interest.

Thus, the district court did not err by granting summary judgment to Chase on the "enforceability defense."

B.

We next address the district court's grant of summary judgment as to the "delay defense." Winget and the Trust first argue that by interpreting the Last Resort provisions as a "timing requirement that ensures that Winget's pledges are the last collateral in line for collection," the district court read out of the Last Resort provisions the requirement that Chase's efforts to collect on the "other collateral" be "reasonable."

To the extent the "other collateral" in the Last Resort provisions consists of assets disposed of in the Venture bankruptcy, the district court did not err in its res judicata holding. As explained above, because the "delay defense" challenges the "reasonableness" of Chase's

conduct in influencing the value of the assets, the appropriate forum for those claims was the bankruptcy court. In short, because Winget's and the Trust's "reasonableness" argument under the Last Resort provisions is functionally an argument challenging the value of the assets in the bankruptcy, the "reasonableness" issue as to the bankruptcy assets has already been litigated.

Winget and the Trust argue, however, that the "other collateral" was not limited to the assets disposed of in the bankruptcy. They assert that the Hyundai proposal was "other collateral" outside the Venture bankruptcy. Thus, they say, whether Chase complied with the Last Resort provisions as to this asset is still at issue, and the district court erred by denying discovery on this issue. However, as the district court noted, the Hyundai proposal "never proceeded beyond letters of intent." Winget and the Trust did not dispute this fact below, arguing instead that Chase prevented Venture from completing the deal by failing to provide the up-front cash necessary to finalize the deal, and stopped Winget from providing it himself. This, they argue, was unreasonable and in violation of the Last Resort provisions. We disagree. The Last Resort provisions require that Chase exercise "reasonable efforts . . . to collect . . . from *other collateral*." Because the Hyundai proposal was never finalized, it was not "collateral" on which Chase could collect.[5] The fact that Chase may have prevented the Hyundai proposal from *becoming* "collateral" is immaterial under the plain text of the Eighth Amendment documents.

---

[5]Winget and the Trust deny that the Hyundai proposal never progressed beyond letters of intent by relying on one word from the deposition of Larry Nyhan, a Chase attorney. Nyhan was asked by Winget's and the Trust's attorney if "the Hyundai letter of intent that awarded Venture new business would have been considered an asset of the company?" Nyhan responded, "yes." Both in their brief and at oral argument, Winget and the Trust asserted that Nyhan accordingly "admitted that the Hyundai Contract was an asset of Venture that was subject to Chase's security interest." We disagree with this reading of the transcript. Winget's and the Trust's attorney's question to Nyhan referred to the Hyundai proposal as a "letter of intent," not as a "contract," and appeared to be asking, hypothetically, whether an arrangement with Hyundai "would have" been considered an asset of the company in the event that the deal progressed beyond the stages of letters of intent.

Winget and the Trust point to no document requiring Chase to advance the funds to make the Hyundai proposal "collateral," and nothing in the contract prevented Chase from using its leverage to stop Winget himself from allowing Venture to complete the deal. In short, the Last Resort provisions do not apply to the Hyundai proposal at all.

Moreover, even assuming that the Hyundai proposal had progressed beyond the point that it did, and that a contract with Hyundai had become an asset of Venture, we would still affirm the district court. There are several provisions of the bankruptcy code that provide a debtor recourse as to the disposal of assets in the course of a bankruptcy proceeding, and Winget and the Trust did not avail themselves of these provisions with regard to the Hyundai proposal during the Venture bankruptcy. Thus, we agree with the district court that the proper forum for Winget and the Trust to raise these concerns would have been the bankruptcy court.

V.

On September 10, 2012, while the reformation issue was being litigated, Winget and the Trust filed a motion for summary judgment, alleging that Count I of Chase's complaint should be dismissed because it should have been litigated in *Winget I*. The motion argued that Chase "deliberately split its claims, bringing suit only to compel monitoring of the guarantor companies in South Africa and Australia, and for strategic reasons choosing not to enforce the . . . Guaranty against the Trust until 2008." The district court denied the motion. We agree with the district court.

> The elements of res judicata are well established:
>
> A claim is barred by the res judicata effect of prior litigation if all of the following elements are present: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies'; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action.

*Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002) (citation and quotation marks omitted).

Only the fourth element is at issue here. An identity of claims means "identity of the facts creating the right of action and of the evidence necessary to sustain each action." *Sanders Confectionary Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 484 (6th Cir. 1992) (citation omitted). *Winget I* was an action about inspection rights—Chase "sought to inspect the financial records of [PIM and Venco]" as well as of Winget personally. *Winget I*, 510 F.3d at 579–80. Chase sought inspection rights to determine whether and how to enforce the guaranties. *Id*. at 585 (noting that the purpose of the inspection rights was "to ensure that there is sufficient collateral to satisfy Winget's debt"). This case, by contrast, is about actually enforcing the guaranties.

Even assuming that there is an identity of facts creating the right of action, the current case required entirely different evidence from *Winget I*. The present case required evidence about how much Winget owed, whether the guaranties were enforceable as a legal matter, and whether certain assets had been disposed of. Winget and the Trust offer no argument that these two cases required the same evidence.

Moreover, *Winget I* arose from Winget's refusal to let Chase inspect the books; there, Winget argued that "the sole right of [Chase] under [the guaranty] documents is to enforce its security interest and apply the proceeds to satisfaction of the Guaranteed Obligations." *Id*. This court disagreed, holding that Chase had the right to inspect the books in case Chase "needs to enforce its security interest at a later time." *Id*. In other words, *Winget I* indicates that this court previously recognized that the right to inspection and the right to enforcement are distinct. And, based on Winget's litigation position in *Winget I*, it appears that he did as well. By arguing that

Chase's only right was enforcement of the guaranties, he was in essence inviting Chase to do precisely what he and his Trust now oppose: enforce the guaranties.

## VI.

Next, Winget and the Trust argue that the entry of final judgment was improper—indeed, they argue it was unconstitutional—because it deprived them of an opportunity to develop and present numerous defenses under Michigan common law and the UCC that they had not previously raised. We disagree.

On November 1, 2012, the district court issued a scheduling order clarifying the issues to be resolved at trial. Those were limited to: (1) the "enforceability defense"; (2) the "delay defense"; and (3) the text of a final judgment should Chase prevail. The scheduling order provided that any objections to it must occur within five days. Winget and the Trust did not file any objections to the issues framed by the district court based on their common law/UCC defenses. In fact, the first mention of Chase's duties under common law and the UCC arose in Winget's and the Trust's opposition to Chase's motion for final judgment.

The purpose of scheduling orders issued pursuant to Rule 16 of the Federal Rules of Civil Procedure is, among other things, "to promote familiarity with the issues actually involved in the lawsuit so that parties can accurately appraise their cases and substantially reduce the danger of surprise at trial." *Clarksville-Montgomery Cnty. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 998 (6th Cir. 1991). In accordance with this principle, objections not made to scheduling orders are waived. *Id.* In this case, the Scheduling Order defined the scope of the issues for trial. Winget's and the Trust's common law/UCC issues are beyond the scope of the parameters in that order. Winget and the Trust admit as much, writing that the district court's order "resolved only the issue of contractual defenses" available to them. True. But these were the only issues in the

Scheduling Order to which Winget and the Trust did not object. The time for Winget and the Trust to raise issues for trial beyond those listed in the Scheduling Order was within the time period specified therein. Contrary to their assertions, Winget and the Trust did not "place[] in issue Chase's compliance with . . . Article 9 [of the UCC]," at least not in a timely manner.

> Once a summary judgment has been entered, no further proceedings in the action are feasible. Thus, in the two-party, single-claim situation the granting of a summary judgment is a "judgment" within the definition of Rule 54(a) and an appeal is proper. The same is true in the multiple-claim or multiple-party situation if the summary judgment disposes of all the claims between or among all the parties.

10A Wright, Miller, et al., Federal Practice and Procedure § 2715 (3d ed.). Following the district court's reformation decision and its order granting summary judgment to Chase on the delay and enforceability defenses, all issues listed in the Scheduling Order had been resolved. Accordingly, there were no more outstanding issues. Thus, the district court's entry of final judgment was proper.

In a footnote, Winget and the Trust also assert that "the district court erroneously interpreted . . . Section 17 of the Guaranty as entitling Chase to an award of fees and costs in prosecuting this action despite Winget's payment . . . of $50 million to Chase . . . ." Although framed as an attack only on the section of the final judgment order's provision regarding attorney fees, Winget and the Trust attempt to resurrect their argument from the district court "that the parties agreed [that Winget's and the Trust's] liability under the guaranty for the Venture debt was limited to $50 million." Indeed, the footnote in Winget's and the Trust's brief states "[u]nder the terms of the Guaranty and Pledges, [the $50 million] payment terminated all of Winget's obligations . . . ." In other words, Winget and the Trust attempt yet again to argue that their payment of $50 million satisfied all their obligations.

Winget and the Trust forfeited any argument that the payment of $50 million terminated their obligations by raising the issue only in a footnote.

> [I]t is generally held that an argument is not raised where it is simply noted in a footnote absent any recitation of legal standards or legal authority. . . . This conclusion is logical, given that a footnote merely supplements an existing argument; it is not, by definition, used to present a new argument or idea.

*Calvert v. Wilson*, 288 F.3d 823, 836–37 (6th Cir. 2002) (internal citations omitted). For these reasons, we affirm the district court on this issue.

## VII.

Finally, Winget and the Trust argue that the district court erred by denying their motions to impose sanctions on Chase's attorneys. We disagree.

We review for an abuse of discretion "the decision [of the district court] to impose sanctions pursuant to Rule 11 . . . [and] 28 U.S.C. § 1927 . . . ." *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010). "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Id.*

"[T]he test for the imposition of Rule 11 sanctions [is] . . . whether the individual's conduct was reasonable under the circumstances." *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 384 (6th Cir. 1997) (citation omitted). Similarly,

> [a] court may sanction an attorney under § 1927 for unreasonably and vexatiously multiplying the proceedings even in the absence of any "conscious impropriety." *Rentz v. Dynasty Apparel Indus., Inc.,* 556 F.3d 389, 396 (6th Cir. 2009) (citation omitted). The proper inquiry is not whether an attorney acted in bad faith; rather, a court should consider whether "an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims."

*Hall v. Liberty Life Assur. Co. of Boston*, 595 F.3d 270, 275–76 (6th Cir. 2010) (citation omitted).

Winget and the Trust argue that in light of the parol evidence as to the formation of the Guaranty, which the district court relied on in its reformation decision, sanctions are appropriate under both Rule 11 and § 1927 because any litigation strategy asking the court to disregard the parol evidence was frivolous. However, in light of the fact that we agree with Chase on Winget's and the Trust's reformation claim, the district court did not abuse its discretion. A litigation strategy, perhaps obviously, is not "unreasonable" or "frivolous" if it is successful.

VIII.

For the foregoing reasons, we affirm the district court's judgment with respect to all claims brought in Winget's and the Trust's cross-appeal. As for Chase's claim regarding the district court's reformation decision, we reverse the judgment of the district court and remand with instructions to enter judgment in favor of Chase on Count I of Chase's complaint.