NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0263n.06

Case No. 21-1568

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JPMORGAN CHASE BANK, N.A., )
)
    Plaintiff, )
)
)
ALTER DOMUS LLC, )
)
    Plaintiff-Appellee, )
)
)
    v. )
)
)
LARRY J. WINGET; LARRY J. WINGET )
LIVING TRUST, )
)
    Defendants-Appellants. )
)

FILED
Jul 01, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF
MICHIGAN

                    OPINION

Before: SUTTON, Chief Judge; BATCHELDER and THAPAR, Circuit Judges.

THAPAR, J., delivered the opinion of the court in which SUTTON, C.J., joined. BATCHELDER, J. (pp. 23–34), delivered a separate dissenting opinion.

THAPAR, Circuit Judge. A tale as old as time? Not quite. But for the past fifteen years JPMorgan Chase Bank has been trying to collect a nearly half-a-billion-dollar debt that Larry Winget and the Larry J. Winget Living Trust guaranteed. Unsurprisingly, they don't want to pay. And as a result, we've already handled eight appeals arising out of this case and related litigation.

Today, we address whether Winget can revoke the Trust, making the trust assets unreachable to Chase. He cannot.

I.

This case arises out of a $450 million loan that Larry Winget's holding company, Venture, obtained to buy a European company. But that company eventually became insolvent, triggering default and acceleration clauses in the loan agreement. JPMorgan Chase Bank—the administrative agent for the lenders—required new collateral to prevent acceleration of the debt.[1] So Winget agreed to guarantee the loan both in his individual capacity and as a representative of the Larry J. Winget Living Trust; Winget is the Trust's settlor (the person who creates the trust), trustee, and sole beneficiary. The guaranty agreement limited Winget's personal liability to $50 million but did not similarly limit the Trust's liability.

In 2003, Venture filed for bankruptcy. This triggered a default under the parties' guaranty agreement and the debt became due. Chase sued both Winget and the Trust to recover. Winget paid $50 million and no longer owes the bank any money in his personal capacity. But the Trust is liable for the rest of the debt, which now amounts to more than $750 million.

Winget, as trustee of the Trust, has resisted paying the Trust's debt at every step. In 2014, nearly six years after Chase sued to recover the debt, Winget revoked the Trust and removed all trust assets. According to Winget, the trust instrument (the document which created the Trust) gave him "the right at any time . . . to revoke or amend th[e] Trust" by his act alone. R. 696-1, Pg. ID 25418. Winget kept the revocation secret for over a year. During this time, the district court entered an amended final judgment establishing that the Trust owed Chase nearly half-a-billion dollars under the guaranty agreement. And the parties were actively litigating whether

---

[1] Alter Domus, LLC is now the administrative agent and thus the appellee in this case. For ease of reference, we refer only to Chase.

Chase could use the trust assets—which, unbeknownst to anyone but Winget, no longer existed—to satisfy that debt.

Winget came clean when he sought a declaratory judgment that would establish that, given the revocation, Chase has no further recourse against him or the assets that were once held in the Trust. Chase counter-claimed, arguing that the revocation was a constructively fraudulent transfer under the Michigan Uniform Fraudulent Transfer Act (MUFTA). The district court agreed with Chase and granted its motion for judgment on the pleadings. Winget didn't appeal this ruling. Rather, he rescinded his revocation, retitling to the Trust all property that it held at the time of the revocation.

But Winget had one more card to play. Before he rescinded the revocation, various LLCs that had been held in the Trust (until Winget revoked it) distributed hundreds of millions of dollars in cash and promissory notes to Winget. When Chase learned about these distributions, it sued Winget for unjust enrichment. Chase moved for summary judgment and sought a constructive trust over the distributions. The district court granted the motion and ordered Winget to place the distributions (both cash and promissory notes) in a constructive trust. In the same order, the district court dismissed Winget's action for declaratory judgment.

The district court entered a final judgment on the fraudulent-transfer claim, the unjust-enrichment claim, and Winget's declaratory-judgment action. Winget appealed all three rulings.[2]

---

[2] After Winget reinstated the Trust, the district court enjoined Winget from further interfering with the trust property. We upheld the injunction, and it remains in place today. *See JPMorgan Chase Bank, N.A. v. Winget*, 801 F. App'x 962 (6th Cir. 2020). According to Chase, Winget's claim for declaratory relief is moot given this injunction. But Winget can (and did) appeal the fraudulent-transfer decision. And since Chase prevails, Winget's claim for declaratory relief necessarily must fail. After all, a declaration that Chase has no recourse against the trust assets is the inverse of whether Chase is entitled to the assets based on a fraudulent transfer. So we need not address mootness nor the declaratory-judgment action.

Given the procedural history and the issues presented in the appeal, we directed the parties to submit supplemental briefing on several questions.

II.

We start with the fraudulent-transfer claim and review de novo the district court's order granting Chase judgment on the pleadings.

A.

A prerequisite to any fraudulent-transfer claim is that a transfer in fact occurred. *See* Mich. Comp. Laws § 566.35(1). MUFTA defines transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." Mich. Comp. Laws § 566.31(q). Thus, when a creditor has access to the assets, and a debtor takes action to fraudulently put those assets beyond the creditor's reach, a creditor has a basis for relief. *Glazer v. Beer*, 72 N.W.2d 141, 143 (Mich. 1955).[3]

The revocation of the Trust constitutes such a transfer. Before the revocation, the Trust had assets that creditors like Chase could take to fulfill the Trust's debt. *See JPMorgan Chase Bank, N.A. v. Winget*, 942 F.3d 748, 750–51 (6th Cir. 2019). But after the revocation, those assets were placed beyond Chase's reach. In other words, the revocation caused the Trust to effectively "part[] with" its assets. Mich. Comp. Laws § 566.31(q). To be sure, the revocation could be considered involuntary as it was done by Winget, not the Trust. But MUFTA explicitly sweeps involuntary transfers within its ambit. *Id.* Thus, the revocation is a transfer under MUFTA.

---

[3] *Glazer* involved the Michigan Uniform Fraudulent Conveyance Act (MUFCA), which was replaced by MUFTA in 1998. But courts interpret the relevant provisions the same under both statutes. *See In re Harlin*, 321 B.R. 836, 839–40 (E.D. Mich. 2005); *see also* Jeffrey L. LaBine, *Michigan's Adoption of the Uniform Fraudulent Transfer Act: An Examination of the Changes Effected to the State of Fraudulent Conveyance Law*, 45 Wayne L. Rev. 1479, 1481, 1488, 1491–92, 1500 (1999).

Winget thinks otherwise. The thrust of his argument is that a debtor can fraudulently transfer only "that which the debtor actually owns." *In re CyberCo Holdings, Inc.*, 382 B.R. 118, 142 (Bankr. W.D. Mich. 2008). And as we explained before, trusts don't usually "own" property. *Winget*, 942 F.3d at 750. Rather, they hold property for the benefit of others. *See, e.g.*, *Wellpoint, Inc. v. Comm'r*, 599 F.3d 641, 648 (7th Cir. 2010); Restatement (Third) of Trusts § 2 cmt. d (Am. L. Inst. 2003). Because he was the Trust's settlor and maintained the power to revoke, Winget suggests that he—rather than the Trust—owned the property held by it. So, according to Winget, revoking the Trust didn't transfer anything; he simply maintained property he already owned.

This is not the first time Winget has made an "ownership" argument. In a prior appeal, he asserted that because he (a non-debtor) "owns" the trust property, Chase can't take it to satisfy the *Trust's* debt. *See Winget*, 942 F.3d at 750. But we rejected that argument, explaining that "if ownership mattered, creditors of a trust . . . could almost never recover from the trust property." *Id.* And that, we said, conflicts with not only Michigan law but also hornbook trust law. *Id.*[4]

At bottom, Winget takes issue with our prior ruling. *See id.* at 750–52. For if there was no initial transfer of property into the Trust (and thus no transfer when it was revoked), presumably there are no trust assets that Chase can reach. In both cases, the assets are (and always were) Winget's as settlor. But just as before, ownership is irrelevant. MUFTA's understanding of "transfer" does not turn on who owns the assets. Instead, it turns on how the revocation affected Chase's access to the assets. *See Glazer*, 72 N.W.2d at 143; *cf. Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1302 (11th Cir. 2020) (interpreting identical language in the Florida Uniform

---

[4] Further, under Winget's theory of ownership, neither a revocable trust nor an irrevocable trust would ever own property. And no one disputes that when an irrevocable trust breaks a contract, a creditor can go after the assets held by the irrevocable trust.

Fraudulent Transfer Act to mean that a transfer occurs "[a]s long as the debtor relinquishes some interest in or control over the asset . . . even if he remains the technical owner of the asset"). The revocation placed the trust assets beyond Chase's reach. Thus, the revocation was a transfer.

Winget still pushes back. He suggests that this case resembles *Meoli v. The Huntington National Bank*, 848 F.3d 716 (6th Cir. 2017). There, we held that a bankruptcy trustee could not hold a bank liable for checking deposits that the debtor made to the bank under a fraudulent-transfer theory. *Id.* at 725–28. We reasoned that the bank acted as a mere conduit and did not maintain sufficient "dominion and control" over the deposits to be a "transferee" under the bankruptcy code. *Id.* at 725–26.[5] Winget argues that the Trust similarly lacked "dominion and control" over the trust assets here because he could demand the property back at any time, much like the debtor in *Meoli* could demand its money from its checking account. According to Winget, without "dominion and control," the Trust was not a transferee when he first placed the property into the Trust. And so the Trust could not be a transferor when Winget later revoked the Trust. Winget again emphasizes that a "debtor can only transfer . . . that which the debtor actually owns." Reply Br. 15 (quoting *In re CyberCo Holdings*, 382 B.R. at 142).

Winget's comparison is unconvincing. In *Meoli*, we emphasized that the bank's "obligation to maintain liquidity" was "sufficiently important to defeat any dominion and control" that the bank might otherwise have over the funds. 848 F.3d at 726 (internal quotation marks omitted). And here, although Winget could demand the trust property back at any time, the Trust did not have to remain liquid. Indeed, so long as the property remained in the Trust, the trustee

---

[5] Although there are some differences between fraudulent transfer under the bankruptcy code and MUFTA, those differences are not relevant here. *Compare* 11 U.S.C. § 548(a), *with* Mich. Comp. Laws § 566.35; *see also* 4 Norton Bankr. L. & Prac. 3d § 67:1.

explicitly had the power to enter contracts and make decisions that could affect the value of the assets in a way that a depository bank can't.

### B.

Having established that a transfer occurred, we now consider whether the transfer was fraudulent. Chase does not contend that Winget *intended* to defraud it by revoking the Trust. Rather, it argues the revocation was constructively fraudulent. *See* Mich. Comp. Laws § 566.35(1). A transfer of assets is constructively fraudulent if: (1) the creditor's claim "arose before the transfer," (2) the debtor was insolvent at the time of transfer or "became insolvent as a result of the transfer," and (3) the debtor did not receive "a reasonably equivalent value in exchange for the transfer." *Id.*; *Dillard v. Schlussel*, 865 N.W.2d 648, 656 (Mich. Ct. App. 2014). Here, all three elements are met.

First, Chase's claim arose well before Winget revoked the Trust. MUFTA defines a "claim" as the "right to payment, whether or not the right is reduced to judgment." Mich. Comp. Laws § 566.31(c). Chase's right to payment arose when Venture began bankruptcy proceedings in 2003. That's because the bankruptcy constituted a default under the company's loan agreement with Chase. And under default, Chase could enforce the guaranty against Winget and the Trust. So Chase's claim arose more than ten years before Winget's 2014 revocation.

Second, the Trust was insolvent after the revocation. Under the Act, a debtor is insolvent if "the sum of the debtor's debts is greater than the sum of the debtor's assets." Mich. Comp. Laws § 566.32. Here, the revocation documents state that Winget revoked the Trust in its entirety. Thus, its assets were zero. Because it owed money to Chase under the guaranty agreement, the Trust was, by definition, insolvent.

Third, the Trust did not receive "reasonably equivalent value in exchange" for the revocation. Indeed, Winget admits that the Trust received nothing. That's the nature of a revocable trust; the settlor can usually revoke at any time, for any reason. The reasonably-equivalent-value requirement thus feels out of place in the revocable-trust context. After all, a trust ceases to exist after it is revoked so it can never receive "reasonably equivalent value." But that doesn't mean a revocation can't be fraudulent. The Trust has a duty to maintain value given its obligation to repay Chase and that in turn determines whether the revocation was fraudulent. *Cf. McCaslin v. Schouten*, 292 N.W. 696, 699 (Mich. 1940) (explaining that what constitutes reasonably equivalent value is "determined from the standpoint of creditors," not debtors). From Chase's perspective, the revocation depleted the Trust, and in exchange, the Trust received nothing from which it could pay the outstanding debt.

Winget complains that this interferes with his contractual right to revoke the Trust at any time. But his right is not unlimited. As we explained in our prior opinion, trusts—both revocable and irrevocable—can enter binding contracts. *Winget*, 942 F.3d at 750. A necessary consequence is that a trust's contractual obligation may affect the rights of third parties, like beneficiaries and settlors, even if they are not themselves parties to the contract. Here, the Trust guaranteed Venture's loan. So when Venture defaulted, the Trust had to pay Chase and could do so with the trust assets. *See id.* at 750–51. That's when Chase's claim to the assets arose. At that time, Winget no longer had an unfettered right to the trust assets—at least not until Chase was repaid. And Winget could no longer revoke the Trust since doing so after Chase's claim arose would (and did) deplete the trust assets, preventing the Trust from fulfilling its obligation to Chase. In this way, Winget's right to revoke was limited by the Trust's obligation to Chase—an obligation Winget himself assumed as trustee.

Winget disagrees. He argues that the Trust's obligation to Chase didn't impact his revocation right since he and the Trust are separate legal persons with separate obligations to Chase. Because he fulfilled his individual obligation, Winget suggests that Chase has no recourse against him for the Trust's debt. Winget is correct: We previously held that he is a separate legal person from the Trust. Indeed, throughout the contract setting up the loan, Winget and the Trust are listed as separate entities. But that doesn't give Winget the right to revoke the Trust after Chase's claim arose. Doing so would allow Winget to interfere with Chase's ability to recover from the Trust under the guaranty agreement. And that arguably constitutes a separate tort: intentional interference with contract. *Cf.* Restatement (Second) of Torts § 766 cmt. b (Am. L. Inst. 1979) (explaining that "there is a general duty not to interfere intentionally with another's reasonable business expectancies . . . with third persons"). It doesn't matter that Winget was not a party to the Trust's contract with Chase; those who tortiously interfere rarely are. *See id.*; *see also Tata Consultancy Servs. v. Sys. Int'l, Inc.*, 31 F.3d 416, 423–24 (6th Cir. 1994) (outlining the development of tortious interference under Michigan law). So separate legal personhood doesn't give Winget license to revoke the Trust to Chase's detriment.

Winget resists this conclusion. Because his right to revoke predated the guaranty agreement, Winget says, Chase had notice of his revocation right and chose not to limit it when negotiating the guaranty. He asserts that we must enforce the parties' agreement as written and find his revocation not fraudulent. Anything else, according to Winget, would rewrite the parties' agreement.

But this goes too far. The guaranty does not say one way or the other how Winget's revocation right interacts with the Trust's obligation. That is a fundamental difference between this case and the case Winget cites for support. *See Cyber Solutions Int'l, LLC v. Pro Mktg. Sales,*

*Inc.*, 634 F. App'x 557 (6th Cir. 2016). There, the agreement explicitly noted that the lender was "assuming the risk" that its rights "might be disrupted" by an earlier lender's security agreement. *Id.* at 565. So contrary to Winget's assertion, restricting his revocation right here does not rewrite the guaranty. It simply applies a default rule in the face of contractual silence.

Winget still pushes back. He likens this case to a priority dispute between creditors and argues that he has the superior claim to the trust assets. In making this argument, Winget emphasizes that Chase was a subsequent, unsecured creditor. But this makes no difference to whether a fraudulent transfer occurred. MUFTA was enacted in large part to protect unsecured creditors like Chase. *See Dillard*, 865 N.W.2d at 662. And here, it appears Winget revoked the Trust just so Chase (an unsecured creditor) could not reach the trust assets. That's exactly the type of conduct MUFTA aims to prevent.

## C.

Perhaps in a last-ditch effort, Winget argues that "fact questions" preclude us from ruling for Chase. He disputes whether he as settlor intended to allow the Trust's guaranty to bind his property or restrict his revocation rights. But that's not relevant. Winget's intent is not part of the analysis for a constructive-fraudulent-transfer claim. *See* Mich. Comp. Laws § 566.35. And nothing in the terms of the guaranty agreement suggests that was the case. In fact, the agreement implicitly recognizes that Winget and the Trust are separate legal entities and that both Winget and the Trust are bound by the agreement. That should have been enough to put Winget on notice that Chase could recover from the Trust upon default.

Because all three elements of fraudulent transfer are met, Chase is entitled to judgment on the pleadings.

III.

Chase also contends that Winget was unjustly enriched by the LLC distributions (both the promissory notes and cash) that he received during the revocation period (after Winget revoked the Trust and before he rescinded the revocation). The district court agreed and granted Chase summary judgment on the unjust-enrichment claim. As a remedy, it imposed a constructive trust over the promissory notes and cash distributions. We review the grant and the remedy in turn.

A.

The doctrine of unjust enrichment is rooted in the idea that no one should be allowed to profit inequitably at another's expense. *Wright v. Genesee County*, 934 N.W.2d 805, 809 (Mich. 2019). To maintain an unjust-enrichment claim under Michigan law, a plaintiff must show (1) the defendant received a benefit from the plaintiff that (2) resulted in an inequity to the plaintiff. *AFT Mich. v. Michigan*, 846 N.W.2d 583, 590 (Mich. Ct. App. 2014). The remedy is restitution. *See Wright*, 934 N.W.2d at 809–10. That's because the goal is not to compensate for an injury (like it would be with a tort or breach-of-contract claim), but to return to the plaintiff the benefit that "unjustly enriched" the defendant.

To begin, we must consider the nature of the LLC distributions and who is entitled to them. Before the revocation, the Trust held membership interests in the LLCs that later distributed cash and promissory notes to Winget during the revocation period. Those who hold membership interests in an LLC are generally entitled to its distributions. But under the amended final judgment Chase had a right to execute on the trust assets—including the LLCs' membership interests—to fulfill the Trust's debt. *See Winget*, 942 F.3d at 750–52. Chase would have typically moved for charging orders entitling it to all distributions arising from the Trust's membership interests. *See* Mich. Comp. Laws § 450.4507(1)–(2). But before Chase could do so, Winget

revoked the Trust and retitled the trust property (including the membership interests) in his own name. Because Winget now held the LLC-membership interests, he received the distributions that would have otherwise gone to Chase under the charging orders.

Retracing this chain of events makes clear that Chase satisfied the elements of unjust enrichment: (1) Winget received a benefit (distributions from the membership interests) that (2) resulted in inequity to Chase. The inequity? Chase could no longer receive the distributions that it would have received with charging orders but for the fraudulent revocation. In other words, Winget "profited inequitably" at Chase's expense. *Wright*, 934 N.W.2d at 809 (cleaned up).

Winget rejects this conclusion on two main grounds. He denies that he was unjustly enriched by the promissory notes and disputes the amount by which the cash distributions unjustly enriched him.

1.

Start with the promissory notes. One of the LLCs distributed the promissory notes to Winget after he revoked the Trust. Winget suggests he was not unjustly enriched by them because they reflect a debt the LLC already owed Winget. Rather than take about $100 million in cash distributions, Winget says he loaned that money back to the LLC to fund operations. And Winget argues that the promissory notes he allegedly received in exchange for these loans merely reflect this debt.

But the timing is key. Chase's right to the LLC's distributions arose once it could obtain a charging order (i.e., when the amended final judgment issued). *See* Mich. Comp. Laws § 450.4507(1)–(2). So if the promissory notes reflect a debt that predates the amended final judgment, they'd be outside the scope of a charging order and Chase isn't entitled to them. But if they're a debt incurred after the judgment, Chase is entitled to them.

Winget argues the former. And to bolster his argument, he points to the deposition testimony of several individuals, including Timothy Bradley, the LLC's manager. The testimony supports Winget's allegation that, for several years before the amended final judgment, rather than taking cash distributions as an LLC member, Winget loaned that money back to the LLC to fund operating costs and the promissory notes represent those loans.

But there's a problem for Winget. The promissory notes include integration clauses that explain "there are no conditions or understandings which are not expressed in this Note." R. 926-26, Pg. ID 30460; R. 926-27, Pg. ID 30465. That means we can't look beyond the four corners of the notes to determine whether they represent a debt from before the amended final judgment. *See JPMorgan Chase Bank, N.A. v. Winget*, 602 F. App'x 246, 256 (6th Cir. 2015) ("[W]here the parties include an explicit integration clause within a contract, that clause is conclusive that the parties intended the contract to be the final and complete expression of their agreement."). Based on the language of the notes, we know only that the LLC "promise[d] to pay" Winget $150,000,000. And that the effective date of these promises was June 29, 2017—nearly two years after the amended final judgment. There is no mention of an earlier agreement. So we can't assume the notes reflect an earlier debt to Winget. And because Chase was entitled to all distributions when the promissory notes were penned, Winget was unjustly enriched by them.

In his supplemental brief, Winget argues that the Trust was not a party to the loans between the LLC and Winget, nor was the Trust a party to the promissory notes that represent those loans. Winget suggests this means the Trust would have had no right to the promissory notes and thus Chase—as the Trust's judgment creditor—has no right to them either.

But these facts don't add up. Winget claims that he personally loaned the money to the LLC rather than receive cash distributions as the LLC's member. Yet until he revoked the Trust,

Winget was not a member of the LLC—the Trust was. Indeed, the Trust was the LLC's only member. And distributions are issued to members, not third parties (which Winget was at the time he alleges the loans were made). That means the LLC would have made distributions to the Trust, not Winget. And it would have been the Trust, not Winget, who loaned back the cash to cover the LLC's operating costs.

There's a simple explanation for why the Trust wasn't a party to the promissory notes: Winget revoked the Trust before the notes were memorialized. Thus, the Trust didn't exist at the time the promissory notes were distributed. But since the revocation was fraudulent, we must consider what would have happened but for the revocation. And but for the revocation, the Trust would have been the LLC's member and the party to whom the LLC issued the promissory notes. So Chase would have been entitled to them under the charging orders.

2.

As for the cash distributions, Winget argues he should not be liable for the portion that he used to pay the federal taxes on the LLCs' income (about $79 million). According to Winget, he was not unjustly enriched by this amount since it was always "earmarked" for taxes. If Chase can recover this portion, Winget suggests, it will receive a greater benefit than he retained. And that violates the purpose of restitution. *See Wright*, 934 N.W.2d at 809–10.

Whether Winget was unjustly enriched by the $79 million paid in taxes depends on whether he is personally liable for the taxes on the LLCs' income. And that in turn depends on who is liable for the Trust's taxes.

First, the LLCs' income. The LLCs elected to be "pass-through" entities for federal income-tax purposes. *See* 26 U.S.C. § 1366. That means the LLCs aren't taxed directly like a C corporation would be. Rather, the LLCs' income, losses, deductions, and credits "pass through"

to its members. *See S Corporations*, I.R.S. (Jan. 18, 2022), https://www.irs.gov/businesses/small-businesses-self-employed/s-corporations. The members then report their allocable share of the LLC's income on their personal tax returns and are taxed at their individual income-tax rates. 26 U.S.C. § 1366. Here, the Trust was the member of the relevant LLCs until Winget revoked the Trust. So the Trust was personally responsible for the taxes on the LLCs' income; the LLCs' income would thus be taxed based on the Trust's tax classification.

LLC members—like the Trust—can't pay for income tax associated with an LLC directly from the LLC's assets. *Cf. Florence Cement Co. v. Vettraino*, 807 N.W.2d 917, 922–23 (Mich. Ct. App. 2011) (explaining that LLC members cannot "treat[] their personal liabilities" as the LLC's liabilities). Rather, the Trust would typically seek a distribution to cover the taxes. But a member with a charging order on its membership interest—like the Trust—can't seek a distribution. That's because, under Michigan's charging-order statute, judgment creditors (here, Chase) are entitled to all distributions regardless of the distribution's purpose. *See* Mich. Comp. Laws § 450.4507(1)–(2). So any distribution here would have gone directly to Chase rather than the Trust.

But even under a charging order, the Trust would remain a member of the LLCs and thus would be liable for the income tax arising from its membership interests. *See id.* § 450.4507(4) ("[T]he member that is the subject of the charging order remains a member of the limited liability company and retains all rights and powers of membership except the right to receive distributions to the extent charged."); *cf. United States v. Basye*, 410 U.S. 441, 453–54 (1973) ("[I]t is axiomatic that each [member] must pay taxes on his distributive share of the partnership's income without regard to whether that amount is actually distributed to him."); *see also* 1 Ribstein and Keatinge on Ltd. Liab. Cos. § 10:24 (June 2022 Update); Jay D. Adkisson, Carter G. Bishop & Thomas E.

Rutledge, *Recent Developments in Charging Orders*, Bus. L. Today, Feb. 2013, at 1–2. To pay the taxes on the LLCs' income, then, the Trust would have had to come up with the money itself.[6]

Who is liable for the Trust's taxes? The district court didn't answer that question. Rather, it assumed without explanation that Winget would be personally liable because the LLCs elected to be taxed as pass-through entities. But that skips a step. The Trust—not Winget—was the member of the LLCs before the Trust was revoked. So who is liable for the taxes on the LLCs' income depends on who is liable for the Trust's taxes. And whether Winget was unjustly enriched by the $79 million turns on this question. If Winget is personally liable, he would have had to pay for the taxes himself, leaving the trust assets to repay Chase. But if the Trust is liable, it would have paid for the taxes out of its own assets and that in turn would have diminished the assets available to Chase. Winget was unjustly enriched only if the former is true.

It isn't clear that Winget was personally liable for the Trust's income tax. For under the Internal Revenue Code, the settlor of a revocable trust typically remains liable for the income tax of the trust only so long as his power to revoke is "exercisable." 26 U.S.C. § 676(a); *see also* Bogert's The Law of Trusts and Trustees § 264.5 (June 2021 Update). Winget was the settlor of the Trust but his power to revoke was likely not "exercisable." That's because his ability to revoke was limited by the Trust's obligation to repay Chase. Indeed, when Winget exercised his right to revoke, it resulted in a fraudulent transfer. So the typical rules for revocable trusts may not apply.

Chase doesn't argue that Winget's revocation right was exercisable. Nor does it point to another provision of the Internal Revenue Code that should apply instead. And that's a problem. After all, it's Chase's burden to show that Winget was unjustly enriched by the full amount of the

---

[6] If at some point the Trust becomes insolvent, the IRS would have priority to any distribution issued by the LLCs rather than Chase. *See* 14A Mertens Law of Fed. Income Tax'n § 54:147 (May 2022 Update).

cash distributions, including the $79 million he paid in taxes. *See AFT Mich.*, 846 N.W.2d at 590. To meet that burden, Chase needed to prove that Winget is personally liable for the Trust's taxes and thus couldn't pay for them out of the trust assets. It didn't meet that burden.

Thus, the district court should have excluded the $79 million from Chase's relief. It didn't. So we reverse that aspect of the district court's decision. That said, Winget was unjustly enriched by the remaining cash distributions. Indeed, Chase has shown it is entitled to all but the $79 million that Winget paid in taxes.

B.

Finally, we turn to the remedy: the constructive trust imposed on the promissory notes and cash distributions. Winget challenges that decision as an abuse of discretion. *See Anchor v. O'Toole*, 94 F.3d 1014, 1025 (6th Cir. 1996).

A constructive trust is "not a real trust" like Winget's Trust. *See* Restatement (Third) of Restitution and Unjust Enrichment § 55 cmt. b (Am. L. Inst. 2011). Rather, it is an equitable remedy that comes into existence after a court determines that the plaintiff is entitled to specific property in the defendant's possession. *In re Omegas Grp., Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994); *see also In re Filibeck Estate*, 853 N.W.2d 448, 449–50 (Mich. Ct. App. 2014). The "trust" language is merely a metaphor: The defendant (here, Winget) holds the designated property "in constructive trust" for the plaintiff (here, Chase). *See* Restatement (Third) of Restitution & Unjust Enrichment § 55 cmt. b (Am. L. Inst. 2011). Translation: The plaintiff has a superior claim to property in the defendant's possession, so the defendant is simply "holding" the property for the plaintiff until it is returned. The practical result is a "mandatory injunction" directing the defendant to surrender the property to the plaintiff. *Id.*

Under Michigan law, a constructive trust may be imposed when "necessary to do equity or to prevent unjust enrichment." *Kammer Asphalt Paving Co. v. E. China Twp. Sch.*, 504 N.W.2d 635, 641 (Mich. 1993) (citation omitted). Constructive trusts are often imposed when the property at issue was "obtained through fraud, misrepresentation, concealment, undue influence," or another circumstance that makes it "unconscionable" for the defendant to "retain and enjoy the property." *Id.* (citation omitted).

And that's exactly what happened here. Winget obtained the promissory notes and cash distributions only because of his *fraudulent* revocation—precisely the behavior that justifies a constructive trust. *See id.* Further, when he rescinded the revocation, Winget told the court that he returned the trust property to "exactly the condition it was [in] immediately before the Trust was revoked." R. 777, Pg. ID 27032. Yet he kept the cash distributions and promissory notes for himself. This behavior is arguably concealment. In any event, Winget's actions directly contributed to the reason the district court imposed the constructive trust. *See Kammer Asphalt Paving*, 504 N.W.2d at 641. Thus, the district court did not abuse its discretion.

Still, Winget attacks the district court's decision on three fronts. First, he argues that a constructive trust is inappropriate when money damages are calculable and the target of the constructive trust is solvent. And here, the Trust is solvent so, Winget says, a constructive trust wasn't necessary.

But that's not the law. In Michigan, a court may impose a constructive trust whenever "necessary to do equity or to prevent unjust enrichment." *Id.* And Michigan courts have upheld constructive trusts against solvent parties. *See, e.g.*, *Sloan v. Silberstein*, 141 N.W.2d 332, 338–40 (Mich. Ct. App. 1966). True, Chase could have sought a money judgment against the Trust. So a constructive trust may be a belt-and-suspenders remedy; that is, it is just a way to ensure the

Trust will pay up. *See* Restatement (Third) of Restitution and Unjust Enrichment § 55 cmt. c (Am. L. Inst. 2011). But that doesn't mean the district court abused its direction by imposing one. *Cf. Winget*, 942 F.3d at 751–52 (describing the "extremely broad" authority that Michigan gives courts to execute judgments (citation omitted)). Indeed, there was reason to believe that Winget— after secretly revoking the Trust—might try to pull another fast one on Chase. A constructive trust ensures he can't.

Next, Winget objects to the fact that the constructive trust directs the assets directly to Chase rather than the LLCs that gave him the distributions (both cash and promissory notes). As he sees it, the LLCs can't be fully restored (the goal of restitution) if the assets go to Chase. But he's got the analysis flip-flopped: The goal of restitution is to extract the unjust benefit from the wrongdoer (Winget) and to return that benefit to the wronged party. *See Wright*, 934 N.W.2d at 810. Here, Chase is the wronged party, not the LLCs. Indeed, had Winget not revoked the Trust, Chase would have been entitled to the distributions—not the LLCs. So the district court did not abuse its direction by imposing a constructive trust on the promissory notes and cash distributions (save for the $79 million paid to the IRS).

And last, Winget argues that imposing a constructive trust on the $79 million he paid to the IRS is "impossible" because those funds are no longer "identifiable." Appellants Br. 51. We need not address this argument. As mentioned above, Chase has not met its burden to prove Winget was unjustly enriched by the $79 million. That means Chase is not entitled to the $79 million currently held in constructive trust and the district court abused its discretion by imposing a constructive trust on this money.

C.

Winget makes additional arguments about the interaction between the fraudulent-transfer claim and the unjust-enrichment claim. He objects to the fact that the two claims are based on the same wrongful conduct: the revocation. And he suggests the unjust-enrichment claim (including the constructive-trust remedy) can't stand because courts may not "grant equitable relief without first determining that the plaintiff has no adequate remedy at law." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 662 (6th Cir. 1996). Winget argues that MUFTA—not equity—provides the remedy. But that misstates Michigan law. MUFTA doesn't supplant common-law remedies like unjust enrichment, it supplements them. Mich. Comp. Laws § 566.42. That means Chase can seek relief under both theories. *See Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 907 (Mich. Ct. App. 2006). And as for the remedy, Michigan courts have held that a constructive trust may be imposed "even where a legal remedy exists." *Reed & Noyce, Inc. v. Mun. Contractors, Inc.*, 308 N.W.2d 445, 448 (Mich. Ct. App. 1981). So in this regard, Winget's gripe with the district court's ruling rings hollow.

IV.

According to the dissent, the above analysis stems from flawed premises. *See* Dissenting Op. 33. Rather than consider the issues presented in this appeal, it would wind back the clock seven years and reverse our prior decision that held the Trust had a binding contract with Chase. *Id.* at 12. The dissent makes several points as to why that decision could be wrong. And if we were working on a blank slate, we would take seriously each of these arguments as well as the competing arguments on the other side. But we aren't working on a blank slate. Our slate is chock full of prior decisions—each building from and relying on our *unchallenged* prior holding that the Trust and Chase have a binding contract.

Before we disturb seven years of litigation based on a single bad apple, we have an obligation to weigh prudential concerns and consider the consequences. *See* 18B C. Wright & A. Miller, *Federal Practice and Procedure* § 4478 (3d ed. Apr. 2022 Update). Indeed, the Supreme Court has explained that courts should be "loath[]" to revisit prior decisions absent "extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Here, we can't properly consider whether extraordinary circumstances might justify revisiting our prior opinion. That's because neither party has asked us to review the so-called rotten apple. The last time Winget challenged the ruling from that appeal was when he sought certiorari in the U.S. Supreme Court. But the Court denied cert. *Winget v. JPMorgan Chase Bank, N.A.*, 577 U.S. 1048 (2015) (mem.). Since then, everyone—court and parties included—has operated within the confines of the ruling, for better or worse. Winget even accepted the ruling as law of the case in a prior appeal. *See* Brief of Appellants at 20 n.6, *JPMorgan Chase Bank, N.A. v. Winget*, No. 19-2194 (6th Cir. Dec. 16, 2019). That concession arguably waived any argument challenging the holding. The dissent doesn't explain why we should overturn a decision that Winget not only waived but has not asked us to review. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) (explaining that a party forfeits an argument if he does not raise it below); *cf. Bousley v. United States*, 523 U.S. 614, 622–23 (1998) (requiring parties to preserve arguments even when binding precedent forecloses them).

To reconsider our prior holding *unprompted* would run contrary to the principle of party presentation—a principle the Supreme Court has told us to take seriously. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579–82 (2020). And for good reason. To start, our adversarial system depends on it. We assume that counsel—rather than courts—know how to best serve their clients. *Id.* at 1579. Courts are merely "passive instruments of government." *Id.* (citation omitted).

Thus, we should not "sally forth each day looking for wrongs to right." *Id.* (citation omitted). Unnecessarily considering (or reconsidering) issues not raised by the parties turns this relationship on its head.

What's more, had Winget asked us to revisit our prior ruling, Chase could have responded. Indeed, Chase might have equally convincing arguments that would support that holding. But we don't know, because Winget didn't ask us to revisit our ruling. In light of the circumstances, it would be inappropriate for us to reconsider seven years of litigation and dozens of judicial opinions.

*       *       *

This litigation may feel like the story that never ends. But for the sake of finality and the swift adjudication of justice—two bedrock principles of our judicial system—we hope this marks the final chapter. We affirm in part and reverse in part.

ALICE M. BATCHELDER, Circuit Judge, dissenting. During the past 15 years, this dispute has generated over 50 judicial opinions: nine in this court and more than 40 in the district court. Almost all are sound. Several are very good, even excellent. One, however, is rotten. And at least the way I see it, this one bad apple spoils the whole bunch.

Rather than continue to accept, and work around, that rotten opinion—and the obstacles that continue to sprout from its holding—I would prefer to correct that decision, apply the law in plain terms, and end this litigation in the way that Judge Cohn decided ten years ago. Therefore, despite my concession that the majority has written a legally sound and rather good opinion, and my recognition of the importance of finality, I will respectfully dissent.

**I.**

A word about revocable trusts. "Under Michigan law, a revocable trust is not a separate legal entity with regard to the rights of creditors." *Mickam v. Joseph Louis Palace Tr.*, 849 F. Supp. 516, 523 (E.D. Mich. 1993) (relying on M.C.L. § 556.128); *accord* M.C.L. § 700.7506(1)(a) ("During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."); *see also In re Hertsberg Inter Vivos Tr.*, 578 N.W.2d 289, 291 (Mich. 1998).

A revocable (or living) trust is just a conceptual way for a person (the settlor or grantor) to organize or manage his or her assets. The settlor transfers title to the assets to the revocable trust but retains full ownership and control over those assets. To the extent that the trustee has any role, the trustee acts at the will of the settlor and owes a fiduciary duty to the settlor. While the settlor is alive, the beneficiary has no rights whatsoever. The settlor can change the terms, change the contents, or even dissolve a revocable trust at any time, for any reason. Accordingly, the settlor's

creditors can reach the assets held in the trust. And the settlor must pay the taxes incurred by assets held in the trust—the trust does not have a tax-identification number or file a tax return.[1]

In stark contrast, a settlor who creates an *irrevocable* trust relinquishes control of the assets to the trustee, who manages the trust under a fiduciary duty to the *beneficiary*. The irrevocable trust becomes its own separate legal entity. The settlor cannot change the terms, change the contents, or dissolve the trust. The settlor's creditors cannot reach the trust assets. And the trustee would file a tax return for the irrevocable trust using a tax-identification number for the trust.

In conceptual terms, opening a revocable trust is like renting a storage unit at the local self-storage facility. You rent a unit and put some of your belongings in there. Over time, you might move any number of things to and from, in and out of the storage unit. That is how it works. You can theoretically put *all* your belongings in there if you want. Or you can empty it and close it, and terminate the lease. So it goes with a revocable trust: fill it, change it, empty it, close it. That is the promise of a revocable trust: you, as settlor, can revoke it at any time. The tradeoff is that your placing of your assets in a revocable trust does not protect your assets from your creditors. But neither do you risk ever losing control over your assets in a revocable trust. Like a self-storage unit, a revocable trust is fundamentally just a place where a settlor keeps his or her assets.

This case involves Larry Winget's revocable trust, which "held most, if not all, of Winget's assets." *JP Morgan Chase Bank, N.A. v. Winget*, 901 F. Supp. 2d 955, 961 (E.D. Mich. 2012). As if to make this even easier, Winget is the Trust's settlor, trustee, and sole beneficiary. The key

---

[1] The real benefits of a revocable trust take effect only after the settlor dies, at which point the settlor—being dead—is no longer able to revoke the trust and it passes (i.e., its contents pass) to the beneficiary(-ies). The most significant benefit is that, by passing via the trust, the transfer of assets avoids probate. The trust might also provide the settlor an easier means of managing the assets after death or during the transition, and in some cases might reduce or defer estate taxes, particularly if some assets are domiciled in another state. Therefore, a revocable trust is almost always used as an estate planning tool—namely, as a will substitute—and is commonly referred to as a *living trust*.

point is that Winget owns the assets, *all of them*, and happens to keep them in his revocable trust. The Trust does not own any assets. As settlor, Winget can move his assets to and from, in and out, of his revocable trust at any time, for any reason. He can put *all* his assets in it if he wants. Or he can empty it and close it. The revocable trust is a storage place, not a distinct legal entity.

## II.

The short story. Winget's company, Venture, borrowed $450 million from Chase and defaulted on the loan with about $350 million outstanding. With Venture facing likely bankruptcy, Chase was left facing a cents-on-the dollar collection. Rather than call the loan, force liquidation, and suffer a substantial ($300-plus million) loss on this loan, Chase and Winget negotiated a loan forbearance agreement in which Chase would continue to extend the $350 million loan in exchange for Winget's new personal Guaranty of certain collateral, with a $50 million limit.

Thereafter ensued a back-and-forth negotiation to finalize the draft written agreement. In one of the proposed edits, Chase added Winget's Trust to the designation of Guarantor because Winget kept the pledged assets in the Trust. Note that, legally, this edit did not change anything: Winget—not the Trust—owned and controlled the assets; Chase, as creditor, could reach those assets in the Trust as if Winget owned them himself; and Winget could remove those assets from the Trust (or even close the Trust) at any time, for any reason. Even at this late date, Chase concedes as much. *See* Chase Br. at 6, (Dkt. No. 19, Sept. 17, 2021) ("Indeed, [Chase] agrees that Mr. Winget had the right to move property in and out of his trust as he saw fit, both before and after the Guaranty was signed."). Because the Trust is revocable, the pledge of assets by Winget-and-Trust is no different from the pledge of assets by Winget alone insofar as Chase's claim to those assets. The Trust did not—and could not—make a Guaranty pledge that was distinct from Winget's. Reciprocally, Winget could not have substituted the Trust as Guarantor to protect

himself personally from Chase's claims; Chase could reach through the Trust to collect from Winget in the same way it could reach through Winget to collect from the Trust. Winget is the owner. The revocable Trust is a storage space for Winget's assets, not a distinct legal entity.

But, during that back-and-forth exchange of the countless proposed edits to the draft written agreement, the parties made a mistake: the editors changed the provision listing the Guarantor to include both Winget and the Trust, but they did not similarly change the provision for the $50-million limit, which was left naming only Winget (not the Trust). We know this was a mistake because the district court held an eight-day trial, heard witnesses, scrutinized evidence, and considered the competing claims. Chase claimed that Winget and the Trust had each given a separate guaranty and, while Winget had limited his guaranty to $50 million, the Trust had given Chase an unlimited guaranty. Winget countered that such an outcome was not their agreement, but was a mistake; that both parties had intended and agreed that the Guaranty was limited to $50 million and the inclusion of the reference to the Trust did not change that. Judge Cohn issued a thorough and meticulous opinion finding as a factual certainty and explaining beyond any doubt that the final version's failure to include the Trust in the limitation provision was a mistake:

> The Winget Trust for purposes of this case is no different than Larry Winget individually. A living, or inter vivos trust, is a common estate planning tool which is often used to control the distribution of assets. *See* Restatement (Third) of Trusts § 25 Validity and Effect of Revocable Inter Vivos Trust (2003). Here, Winget was the settlor, trustee, and beneficiary of the Winget Trust. As settlor, Winget owned the assets in the Winget Trust. *See* M.C.L. § 556.128. The Winget Trust was essentially Winget's alter ego. Winget used the Winget Trust to hold ownership of many of his assets, including the pledged stock. It had no special significance for purposes of this case.

> The Winget Trust was purposely added to the [Guaranty] and related documents to secure ownership of the pledged stock. It was not added to secure any additional liability. As such, the failure to include the Winget Trust under [the limitation provision] was a mistake. It was a mistake that was overlooked by both parties. It is a mistake that the Court has the power to correct.

*Winget*, 901 F. Supp. 2d at 972 (minor edits to capitalization). The court held that the $50-million limitation applied to Winget and the Trust together. Winget wired a $50 million payment to Chase. *JP Morgan Chase Bank, NA v. Winget*, No. 08-13845, 2014 WL 320686, at *1 n.1 (E.D. Mich. Jan. 29, 2014). Thus, while certain collateral claims and issues remained, this effectively ended Chase's claim to recover against Winget or the Trust under the terms of the Guaranty.

**III.**

Now the bad apple. When Chase claimed on appeal that the parties had not been mistaken, the panel agreed and held that "[t]he agreement executed by Winget, the Trust, and Chase reflected the parties' intent as a matter of law," such that the parties necessarily intended that Winget and the Trust were separate entities with "Winget, and only Winget [alone], as having limited exposure." *JPMorgan Chase Bank, N.A. v. Winget*, 602 F. App'x 246, 258-59 (6th Cir. 2015). Not only does that proposition fail as a matter of common sense, it is fundamentally flawed as a matter of trust law. The Trust, being a revocable trust, is not a distinct legal entity separate from Winget; it is just a place for Winget to store his assets. The only aspect of the analysis with which I can agree is the off-the-cuff statement that "the district court should never have held a trial in the first instance." *Id*. at 258. That is true, but not for the reasons stated in the opinion. Rather, a trial was unnecessary because the "mistake" theory was unnecessary. For purposes of Chase's creditor claim, Winget and the Trust necessarily merged into Winget alone; they are not separate entities, they are both just Winget as the one and only true owner of the assets. Winget pledged the assets to guaranty the loan and the agreement limited that pledge to $50 million.

The opinion's proffered analysis of this issue is specious. After characterizing the district court's decision as based on a "scrivener's error" (in which parties reach an agreement, or meeting of the minds, but then make a mistake when memorializing that agreement, i.e., reducing it to

written form), the opinion rejects and completely discards the district court's trial-based findings of fact in favor of its own factual finding: "We disagree with the district court's interpretation and conclude that there was no prior agreement between the parties." *Id*. at 258. The opinion offers three reasons: (1) there was no "binding contract" until the parties signed the final version; (2) the pre-agreement documents were not a binding agreement; and (3) the agreement contained an integration clause. *Id*. The first two "reasons" do not disprove a scrivener's error, they are universal circumstances underlying a scrivener's error: the parties reached a mutual understanding but, during the back-and-forth bickering over the written specifics, committed a mutual mistake that was erroneously included in the final, binding document.

Reliance on the integration clause is equally wrong. Once it is established (as the district court did here) that the parties were mistaken about the substantive terms of the document (i.e., the important parts), the only reasonable corollary is that those same parties were equally mistaken about the integration clause. If this purported "reason" were valid, and the inclusion of a boilerplate integration clause necessarily overcomes any and all mutual mistakes in the formation of a contract (meeting of the minds), then the doctrine of mutual mistake would cease to exist.

Instead, "[i]t is widely agreed that oral testimony is admissible to prove fraud or misrepresentation, mistake or illegality. [And] [t]his exception to the parol evidence rule applies even if the testimony contradicts the terms of a completely integrated writing." 6 Peter Linzer, *Corbin on Contracts* § 25.20, at 277 (2010). As for Michigan law, parol evidence is generally not admissible to vary the terms of a contract which is clear, unambiguous, and fully integrated, but this "overlooks the prerequisite to the application of the parol evidence rule: there must be a finding that the parties intended the written instrument to be a complete expression of their agreement as to the matters covered." *NAG Enterprises, Inc. v. All State Indus., Inc.*, 285 N.W.2d 770, 771

(Mich. 1979). Thus, it is well settled that parties may submit parol evidence to prove that an agreement was the product of mistake. *Goldberg v. Cities Service Oil Co.*, 266 NW 321, 325 (Mich. 1936); *Scott v. Grow*, 3 N.W.2d 254, 258 (Mich. 1942) ("It is not necessary . . . [to show] that particular words were misunderstood. It is sufficient that the parties had agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effectuate their intention." (quoting 5 Williston on Contracts, Rev. Ed., § 1585)).

We were wrong in *Winget*, 602 F. App'x at 257-59. The district court was right in *Winget*, 901 F. Supp. 2d at 972. And this case should have ended with the determination that Winget and the Trust were one and the same, with the $50 million limitation applicable to both.

Instead, because we held that Winget and the Trust are separate entities and the Trust agreed to an unlimited guaranty, Chase has pursued litigation against the Trust in an effort to take assets that the Trust does not own, could not have pledged, and did not agree to pledge.

## IV.

This brings us to the present appeal and the majority opinion, which confronts and decides certain needlessly complicated questions. These questions are "needlessly complicated" because our prior (incorrect) holding compels the majority to proceed from the flawed premise that Winget's revocable Trust is something other than an ordinary revocable trust.

Consider the "transfer" question—whether Winget "transferred" assets when he removed assets from his revocable Trust (i.e., revoked his revocable trust). *See* Maj. Op. § II.A. In any other case—every other case—this is a simple question with a simple answer: because this is a *revocable* trust, there was no transfer. Winget owned the assets, regardless of where he kept them. *See* M.C.L. § 556.128 ("When the grantor in a conveyance reserves to himself an unqualified power of revocation, he is thereafter deemed still to be the absolute owner of the estate conveyed,

so far as the rights of his creditors and purchasers are concerned."). Winget's act of closing the Trust did not "dispose of or part with" any assets. The Michigan Uniform Fraudulent Transfers Act (MUFTA) defines "transfer" as: "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, *of disposing of or parting with* an asset or an interest in an asset." M.C.L. § 566.31(q) (emphasis added). Here, Winget owned the assets both before and after he closed the Trust. As a matter of Michigan trust law, Winget's movement of the assets out of his *revocable* Trust did not affect Chase's rights at all. *See* M.C.L. § 700.7506(1)(a) ("During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors.").

It is only due to our faulty holding in *Winget*, 602 F. App'x at 257-59—contrary to Michigan law, *see Mickam*, 849 F. Supp. at 523—that this revocable Trust is not a normal revocable trust, but is instead treated as a distinct legal entity that pledged to Chase the assets therein. This requires that the Trust—not Winget—own the assets, inasmuch as the word "assets" involves ownership. *See*, *e.g.*, Merriam-Webster Online (offering a definition of "assets" as "the entire property of a person, association, corporation, or estate applicable or subject to the payment of debts"); Dictionary.com ("items or resources owned by a person, business, or government"). If the Trust does not own these items, then they would hardly qualify as the Trust's "assets."

The majority navigates this complication by proposing that "ownership is irrelevant" to the fraudulent transfer; the act of moving the assets beyond Chase's reach makes this a "transfer." If ownership mattered, and Winget owned the assets (unequivocally the situation under ordinary Michigan trust law), then Winget's act of closing the Trust did not transfer (dispose of or part with) any assets, *see* M.C.L. § 566.31(q). Therefore, the Trust entity must have disposed of or parted with the assets (by returning them from whence they came, namely, Winget's personal ownership

and possession), thus moving them beyond Chase's reach. Of course, if this were an ordinary revocable trust, this movement of assets would not put them beyond Chase's reach.

The question of "fraudulent" is similarly convoluted. *See* Maj. Op. § II.B. Under ordinary trust law, the assets held in the Trust are entirely Winget's assets, so Chase's claim against the Trust would just fold back into a claim against Winget, whether Winget placed the assets in the Trust or not. *See* M.C.L. §§ 556.128 & 700.7506(1)(a). Of course, Chase agreed to limit its recovery from Winget to $50 million. But, otherwise, Winget could not avoid Chase's claim by transferring assets to or from his Trust, and therefore could not commit a "fraudulent" transfer.

Our prior faulty opinion in *Winget*, 602 F. App'x at 257-59, again complicates this by holding that the Trust is its own entity, and it owns the assets. The majority declares that the Trust is the "debtor," and finds that "the Trust was insolvent after the revocation," inasmuch as "its assets were zero." This presupposes that the Trust—not Winget—owned the assets; if Winget owned the assets and simply stored them in his revocable trust, then the "Trust's assets" were zero all along. Similarly, a finding that the Trust did not receive reasonably equivalent value in exchange for the revocation also presupposes that the Trust owned the assets. If the Trust "owned" nothing, then it *did* receive equivalent value. Namely, nothing. Of course, on this same reasoning, Winget received nothing when he placed his assets into the Trust, certainly unaware that he was "transferring ownership" and could not recover his assets from his revocable trust without paying equivalent value in exchange (i.e., buying his own property back from his own Trust).

On Winget's argument that as the settlor of a revocable trust he has a fundamental right revoke the trust at any time, the majority answers that his right is not unlimited: the Trust's contractual obligation to its creditor prevents the settlor from revoking the revocable trust. Thus, as a practical matter, this means a trustee can convert a revocable trust into an irrevocable trust by

entering a contract with a third-party, effectively making the third-party the trust beneficiary, and can do so, apparently, without the settlor's agreement or participation. In fact, the majority suggests that a settlor who removes his encumbered assets from his revocable trust does not just assume the obligations against those assets, *see* M.C.L. §§ 556.128 & 700.7506(1)(a), that settlor commits an intentional-interference-with-contract tort. That is far afield from ordinary trust law.

Finally, consider the taxes. *See* Maj. Op. at § III.A.2. Under ordinary trust principles, the settlor of a revocable trust pays any incurred taxes—a revocable trust does not even have a tax-identification number, much less a means of filing or paying taxes. Again, the basic principle of revocable trusts is that the trust does not own anything, it is just a place for the settlor to store his assets. Because the settlor owns the assets placed in the trust, the settlor pays the taxes. Again, considering this question under ordinary trust law, Winget—the settlor—owned the assets held in the trust, including the LLC distributions, so Winget was obliged to report the income on his personal income tax returns and was responsible for paying the taxes incurred by the LLCs.

The majority recognizes that "the typical rules for revocable trusts may not apply" and suggests that the Trust may have been responsible for paying its own taxes. As a practical matter, this would require the Trust (i.e., the trustee, Winget, I suppose) to formally convert the Trust to an irrevocable trust, to obtain a tax-identification number from the IRS, prepare and file a tax return, and pay the requisite taxes to the IRS. Of course, the IRS was expecting Winget—as the settlor of the revocable Trust—to pay the taxes, so this new undertaking might involve a filing amendment (reducing Winget's personal taxable income and, correspondingly, his tax liability), a refund of Winget's $79 million overpayment, or a repayment by the Trust to Winget for the taxes he erroneously paid on the Trust's behalf (perhaps with its own tax consequences).

All of this is merely to demonstrate, or emphasize, how very far we have ranged from ordinary trust law. And to submit that, along these lines, things are getting worse, not better.

**V.**

Our prior faulty opinion in *Winget*, 602 F. App'x at 257-59, stated or necessarily implied three findings or conclusions that have served as premises for all of the judicial decisions that have followed: (1) the revocable Winget Trust is a separate legal entity, distinct from its settlor, Larry Winget; (2) the Trust entity—not the settlor, Winget—owns the assets held in the revocable Trust; and (3) the trustee of this Trust entity (Winget) pledged the "Trust's assets" as an unlimited Guaranty on Chase's entire loan. I find all three to be legally unsound and factually untrue.

The majority's opinion, like other judicial opinions since *Winget*, 602 F. App'x at 257-59, accepts these premises and ingeniously builds its analysis around them, leading to certain new propositions that will likely serve as premises for future judicial decisions: (1) the Trust's pledge of assets converted Winget's revocable trust to an irrevocable trust, forfeiting Winget's ownership and control of the assets (and eliminating his tax obligation); and (2) Winget's attempt to control his assets (i.e., revoke his revocable trust) under ordinary principles of revocable trusts was not only a fraudulent transfer, but possibly an intentional-interference-with-contract tort.

For all of my criticism here, I recognize that the majority here, like others before, has diligently and thoroughly built its analysis around the given premises to reach a justifiable and defensible conclusion. But I also recognize that, in so doing, with every successive judicial opinion in this case, or application of these opinions as precedent, we do further damage to trust law.

Rather than continue to craft new, and increasingly creative, proclamations about the law of revocable trusts, I would prefer to admit our mistake in *Winget*, 602 F. App'x at 257-59, correct it, and apply plain and ordinary revocable-trust principles in a plain and ordinary way.

I believe that Judge Cohn was correct: "The Winget Trust for purposes of this case is no different than Larry Winget individually." *Winget*, 901 F. Supp. 2d at 972. Therefore, the $50-million limitation applied to Winget and the Trust together, Winget has paid Chase that $50 million, and Chase has no further recourse against Winget (or the Trust) on the Guaranty.

Moreover, I believe that the Trust and Winget are not separate entities; the Trust, being a revocable trust, is just a place for Winget to put his assets and Winget had every right to fill it, change it, empty it, or close it however he saw fit. Winget owns all the assets, the Trust "owns" nothing. Winget's revocation of the revocable Trust was not a fraudulent transfer—indeed was not a transfer at all—nor was it an intentional-interference-with-contract tort. And Winget is personally liable for the taxes incurred by the Trust.

Given the importance of finality—and the majority's compelling defense of it, *see* Maj. Op. at § IV—I should concur. But in the perhaps vain hope that this small gesture might help restrain the opinions and holdings in this case to just this case, I will respectfully dissent.